# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2011

No. 08-61093

Lyle W. Cayce
Clerk

NATIONAL PORK PRODUCERS COUNCIL; AMERICAN FARM BUREAU FEDERATION; OKLAHOMA PORK COUNCIL; UNITED EGG PRODUCERS; NORTH CAROLINA PORK COUNCIL; NATIONAL CHICKEN COUNCIL; U.S. POULTRY & EGG ASSOCIATION; DAIRY BUSINESS ASSOCIATION INC; NATIONAL MILK PRODUCERS FEDERATION,

Petitioners

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

NATURAL RESOURCES DEFENSE COUNCIL, INC; SIERRA CLUB; WATERKEEPER ALLIANCE ,

Intervenors

Transferred from the
Judicial Panel on Multi-District Litigation

Before BARKSDALE, STEWART, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

In 2003, the Environmental Protection Agency (EPA) revised its regulations, implementing the Clean Water Act's (CWA or the Act) oversight of Concentrated Animal Feeding Operations (CAFOs).  Several parties challenged

No. 08-61093

the 2003 revisions (hereinafter the 2003 Rule), and the Second Circuit reviewed the challenges in *Waterkeeper Alliance, Inc. v. Environmental Protection Agency,* 399 F.3d 486 (2d Cir. 2005).  In 2008, the EPA,  responding to *Waterkeeper*, revised its regulations (hereinafter the 2008 Rule or the Rule).  Subsequently, the Farm Petitioners[1] jointly with the Poultry Petitioners[2] filed petitions for review of the 2008 Rule with this court and the Seventh, Eighth, Ninth, Tenth, and D.C. Circuits.  Shortly after the issuance of the 2008 Rule, the EPA sent guidance letters to members of Congress and to a CAFO executive (hereinafter the EPA Letters or guidance letters).  The Poultry Petitioners filed a petition for review in this Circuit, challenging the EPA's procedures for issuing rules that the Poultry Petitioners allege were final.  These petitions for review were consolidated by the Judicial Panel on Multi-district Litigation (JPML), pursuant to 28 U.S.C. § 2112(a)(3), and this court was randomly selected to review the parties' challenges.  Subsequently, the Environmental Intervenors[3] filed a motion to intervene in support of the EPA's position.  Also, the EPA filed a motion to dismiss the Poultry Petitioners' challenges to the guidance letters.  We GRANT the petitions in part, DENY the petitions in part, and GRANT the EPA's motion to dismiss.

## I. BACKGROUND

At issue here is the EPA's regulation of animal feeding operations (AFOs). AFOs are facilities that house, raise, and feed animals until they are ready for

---

[1] The "Farm Petitioners" are the National Pork Producers Council, American Farm Bureau Federation, United Egg Producers, North Carolina Pork Council, National Milk Producers Federation, Dairy Business Association, Inc., Oklahoma Pork Council, National Chicken Council, and U.S. Poultry & Egg Association.

[2] The "Poultry Petitioners" are the National Chicken Council, and U.S. Poultry & Egg Association.  Although these parties are also "Farm Petitioners," the arguments made in the Poultry Petitioners' brief apply only to them and not the other Farm Petitioners.

[3] The "Environmental Intervenors" are the Natural Resource Defense Council, Sierra Club, and Waterkeeper Alliance.

No. 08-61093

transport to processing facilities that prepare meat for shipment and, eventually, consumption. Because these facilities house hundreds and sometimes thousands of animals in confined spaces, they produce millions of tons of animal manure every year.[4] The management of this manure involves the collection, storage, and eventual use of the manure's nutrients as fertilizer.[5] Following its collection, the manure is typically transported to an on-farm storage or treatment system.[6] Treated manure effluent or dry litter (chicken waste) is typically applied to cropland as fertilizer.[7] This fertilizing process is called land application.[8]

Because the improper management of this waste can pose a significant hazard to the environment, the EPA focuses much of its attention on regulating certain AFOs that meet the EPA's definition of a CAFO.[9] According to EPA regulations, CAFOs are facilities where "[a]nimals . . . have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-month period . . . ." 40 C.F.R. § 122.23(b)(1)(i). Our analysis of the petitioners' challenges to the 2008 Rule necessitates a discussion of the statutory and regulatory scheme underlying the EPA's oversight of CAFOs.

---

[4] Sara R. Reichenauer, *Issuing Violations Without Tangible Evidence: Computer Modeling for Clean Water Act Enforcement*, 95 IOWA L. REV. 1011, 1019 (2010).

[5] Thomas R. Head, III, *Local Regulation of Animal Feeding Operations: Concerns, Limits, and Options for Southeastern States*, 6 ENVTL. LAW. 503, 515 (Feb. 2000) ("In particular, animal waste must be stored while awaiting disposal. Waste typically is stored in large open-air tanks or anaerobic lagoons, which can be used to treat as well as store waste.").

[6] *Id.*

[7] *Id.* at 515–16.

[8] *Id.* at 516.

[9] Reichenauer, 95 IOWA L. REV. at 1019–20 ("Data suggests that agriculture is the most harmful source to our nation's waters, causing the EPA to focus much of its attention on agriculture entities, specifically CAFOs and potential CAFOs.").

No. 08-61093

## A. Statutory Background

In 1948, Congress enacted the Federal Water Pollution Control Act (FWPCA).[10]  FWPCA encouraged states to enact uniform laws to combat water pollution, recognizing "that water pollution control was primarily the responsibility of state and local governments."[11]  The state-run regulation of discharges "involved a complex process in which the government was required to trace in-stream pollution back to specific discharges, and, given the difficulty of this task, enforcement was largely nonexistent."[12]  The federal government's power to curtail water pollution was also limited under FWPCA.  Thus, federal action against a discharger could only proceed "with the approval of state officials in the state where the discharge originated and after a complicated series of notices, warnings, hearings, and conference recommendations."[13]  In 1972, FWPCA was amended to replace the state-run regulation of discharges with an obligation to obtain and comply with a federally-mandated National Pollutant Discharge Elimination System (NPDES) permit program.[14]  These amendments also transformed FWPCA into what is known today as the CWA.[15]

The NPDES permit program, which is primarily articulated in 33 U.S.C. § 1342, allows the EPA to "issue a permit for the discharge of any pollutant, or combination of pollutants . . . ."  33 U.S.C. § 1342(a)(1).  To be clear, the CWA

---

[10] Jeffrey M. Gaba, *Generally Illegal: NPDES General Permits Under the Clean Water Act*, 31 HARV. ENVTL. L. REV. 409, 413 (2007).

[11] Kenneth M. Murchison, *Learning from More than Five-and-a-Half Decades of Federal Water Pollution Control Legislation: Twenty Lessons for the Future*, 32 B.C. ENVTL. AFF. L. REV. 527, 530–31 (2005).

[12] Gaba, 31 HARV. ENVTL. L. REV. at 414.

[13] Murchison, 32 B.C. ENVTL. AFF. L. REV. at 531.

[14] *Id*. at 541–42.

[15] *Id*. at 536 n.71.

No. 08-61093

prohibits the discharge of pollutants into navigable waters. 33 U.S.C. § 1311. However, if a facility requests a permit, it can discharge within certain parameters called effluent limitations and will be deemed a point source. 33 U.S.C. §§ 1342, 1362(14). Accordingly, the point source will be regulated pursuant to the NPDES permit issued by the EPA or one of 46 States authorized to issue permits.[16] Relevant here, the definition of point source excludes "agricultural stormwater discharges." *Id.* § 1362(14). This occurs, for example, when rainwater comes in contact with manure and flows into navigable waters. *See, e.g., Fishermen Against Destruction of Env't, Inc. v. Closter Farms, Inc.*, 300 F.3d 1294, 1297 (11th Cir. 2002) (citing *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 121 (2d Cir. 1994) (holding that "agricultural stormwater discharge" exemption applies to any "discharges [that] were the result of precipitation")).

If a CAFO discharges without a permit, it is strictly liable for discharging without a permit and subject to severe civil and criminal penalties. 33 U.S.C. § 1319. For example, monetary sanctions can accrue at a rate of up to $50,000 per violation, per day, for criminally negligent violations, or up to $100,000 per violation, per day, for repeated, knowing violations. *Id.* Criminal violators may be subject to imprisonment. 40 C.F.R. § 122.41(a)(2).

## B.   CAFO's Regulatory Background

The EPA enacted the first set of CAFO regulations in 1976. Since that

---

[16] Currently, 46 states are authorized to administer their own permitting programs for the discharge of pollutants into navigable waters in lieu of the federally administered NPDES program. *See* STATE NPDES PROGRAM AUTHORITY, available at http://www.epa.gov/npdes/images/State_NPDES_Prog_Auth.pdf. Where a state has been authorized to administer its own program, the state becomes the NPDES permit-issuing agency in lieu of the EPA. For these state programs, the EPA retains oversight and veto authority, as well as authority to enforce any violation of the CWA or of a state-issued discharge permit. *See* 33 U.S.C. § 1342(c), (d), and (i). For purposes of this opinion, references to the EPA's implementation of the CWA or the EPA's regulations also refers to authorized states' implementation of the CWA.

No. 08-61093

time, the substance of these regulations, regarding CAFOs, has changed only twice, in 2003 and 2008. We discuss the applicable portions of these regulations below.

### 1.    1976 Regulations

The 1976 regulations specified that CAFOs that wanted to discharge were required to have a permit primarily based on the number of animals housed in the facility. All large CAFOs, those with 1,000 or more animals, were required to have an NPDES permit to discharge pollutants. 41 Fed. Reg. 11,458, 11,458 (Mar. 18, 1976).[17]   Medium CAFOs, those with 300 to 1,000 animals, were required to have a permit if they emitted certain discharges. *Id.* Finally, most small CAFOs, those with 300 animals or less, generally were not required to have a permit. *Id.* However, the EPA could determine that a permit was required on a case-by-case basis if a small CAFO emitted certain discharges after an onsite inspection and notice. *Id.* Under this regulatory scheme, if a discharging CAFO was required to have a permit, but did not have one, it would be subject to civil or criminal liability.

The 1976 regulatory scheme was in place for almost thirty years. However, after being sued for failing to revise the effluent limitations for CAFO operations, the EPA revised its regulations "to address not only inadequate compliance with existing policy, but also the 'changes that have occurred in the animal production industries.'" *Waterkeeper*, 399 F.3d at 494 (citing 66 Fed. Reg. 2960, 2972 (Jan. 12, 2001)). Subsequently, in the 2003 Rule, the EPA shifted from a regulatory framework that explained what type of CAFO *must have* a permit to a broader regulatory framework that explained what type of CAFO *must apply* for a permit.

### 2.    The 2003 Rule & *Waterkeeper*

---

[17] For purposes of clarity, we refer to overruled regulations or regulations being challenged using the Federal Register, as opposed to the Code of Federal Regulations.

No. 08-61093

Under the 2003 Rule, all CAFOs were required to apply for an NPDES permit whether or not they discharged. 68 Fed. Reg. 7176, 7266 (Feb. 12, 2003). Specifically, every CAFO was assumed to have a "potential to discharge" and had to apply for an NPDES permit. *Id*. at 7266–67. However, an option built into the Rule permitted a CAFO to request from the EPA a "no potential to discharge" determination. *Id*. If the CAFO proved that it did not have the potential to discharge, the CAFO was not required to seek a permit. *Id*. The 2003 Rule also expanded the definition of exempt "agricultural stormwater discharge" to include land application discharge, if the land application comported with appropriate site-specific nutrient management practices. *Id*. at 7198. However, if the land application was not in compliance with those practices, the land application discharge would be an unpermitted discharge in violation of the CWA. *Id*. at 7197.

Furthermore, the 2003 Rule created a mandatory duty for all CAFOs, applying for a permit, to develop and implement a site-specific Nutrient Management Plan (NMP). *Id*. at 7176. An NMP required a CAFO to establish "best management practices" (BMPs). *Id*. at 7213–14. The BMPs were designed to ensure adequate storage of manure and wastewater, proper management of mortalities and chemicals, and appropriate site-specific protocols for land application. *Id*. at 7176. The BMPs were neither reviewed by the EPA nor were they included in the terms of a CAFO's permit to discharge.

In *Waterkeeper*, the Environmental Petitioners (Waterkeeper Alliance, Inc., Sierra Club, Natural Resources Defense Council, Inc., and the American Littoral Society) and the Farm Petitioners (American Farm Bureau Federation, National Chicken Council, and the National Pork Producers Council), many of whom are petitioners or intervenors in the present matter, challenged the 2003 Rule on several grounds. 399 F.3d at 497. Specifically, the petitioners challenged the 2003 Rule's duty to apply and the type of discharges subject to

7

regulation.  *Id.* at 504.

The Farm Petitioners asked the Second Circuit to vacate the 2003 Rule's "duty to apply" because it was outside of the EPA's authority.  The court agreed and held that the EPA cannot require CAFOs to apply for a permit based on a "potential to discharge."  *Id.* at 504–06.  The Second Circuit explained that the plain language of the CWA "gives the EPA jurisdiction to regulate and control only actual discharges—not potential discharges, and certainly not point sources themselves."  *Id.* at 505.  In sum, the Second Circuit held that the CWA "on its face, prevents the EPA from imposing, upon CAFOs, the obligation to seek an NPDES permit or otherwise demonstrate that they have no potential to discharge."  *Id.* at 506.

The Environmental Petitioners took issue with the 2003 Rule's exclusion of agricultural stormwater discharge, resulting from land application, from the definition of "point source discharge."  They argued that the CWA requires that *all* discharges from a CAFO are point source discharges, "notwithstanding the fact that agricultural stormwater discharges are otherwise deemed exempt from regulation."  *Id.* at 507.  The Second Circuit disagreed.  The court explained that the CWA is "ambiguous as to whether CAFO discharges can ever constitute agricultural stormwater."  *Id.*  Thus, the court examined whether the exemption for certain land application discharges was grounded in a permissible construction of the CWA.  *Id.*  The Second Circuit determined that congressional intent and its precedent supported the EPA's exclusion of agricultural stormwater discharge, resulting from land application, from designation as a point source.  *Id.* at 507–09.

The Environmental Petitioners also argued that the 2003 Rule was unlawful because "(1) it empowers NPDES authorities to issue permits to . . . CAFOs in the absence of any meaningful review of the [NMPs] those CAFOs have developed; and (2) it fails to require that the terms of the [NMPs] be

included in the NPDES permits." *Id.* at 498. The Second Circuit agreed and held that by failing to provide for EPA review of the NMPs, the 2003 Rule violated the statutory commandments that the permitting agency must assure compliance with applicable effluent or discharge limitations. *Id.* at 502–03.

The parties also disputed "whether the terms of the [NMPs], themselves, constitute effluent limitations that must be included in the NPDES permits." *Id.* at 502. The Second Circuit held that because the 2003 Rule failed to require that the terms of NMPs be included in NPDES permits, the 2003 Rule violated the CWA. The court explained that the CWA defined effluent limitation as "'any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources . . .'" *Id.* at 502 (quoting 33 U.S.C. § 1362(11)). Thus, because "the requirement to develop [an NMP] constitutes a restriction on land application discharges only to the extent that the [NMP] actually imposes restrictions on land application discharges[,]" the CWA's definition of effluent limitations encompassed an NMP. *Waterkeeper*, 399 F.3d at 502.

### 3.   The Present Petitions for Review: The 2008 Rule

At issue here is the 2008 Rule, the EPA's response to the Second Circuit's decision in *Waterkeeper*. *See* 71 Fed. Reg. 37,744 (June 30, 2006). Also at issue are three guidance letters issued by the EPA in response to questions raised by members of the United States Congress and a farm executive about the 2008 Rule. Below, we discuss in further detail the 2008 Rule and the Farm Petitioners' and Poultry Petitioners' challenges to the 2008 Rule, as well as the Poultry Petitioners' challenge to the EPA's issuance of the guidance letters.

### a.   The 2008 Rule

As required by the Administrative Procedures Act (APA),[18] on June 30,

---

[18] The relevant portion of the APA, 5 U.S.C. § 553, requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register . . . ." *Id.* § 553(b).

No. 08-61093

2006, the EPA published a notice of proposed rulemaking (hereinafter the Proposed Rule) setting forth its response to the Second Circuit's decision in *Waterkeeper*. *See* 71 Fed. Reg. at 37,744. In place of the 2003 Rule's duty to apply for a permit, the Proposed Rule required that a CAFO owner or operator apply for a permit only if the CAFO "discharges or proposes to discharge pollutants". *Id*. at 37,747 (internal quotation marks omitted). Furthermore, the Proposed Rule responded to the Second Circuit's holding about the incorporation of NMP requirements into permits. *Id*. at 37,753–55. Specifically, the Proposed Rule required that any NPDES permit issued to a CAFO include the requirement to develop and implement an NMP, including land application requirements. *Id*. at 37,551. Moreover, the NMP must be submitted, in its entirety, with the CAFO's permit application, must be reviewed by the agency and the public, and must have its terms incorporated into the applicable permit as enforceable effluent limitations. *Id*.

The EPA received several hundred responses to the Proposed Rule. 73 Fed. Reg. 12,321-02, 12,324 (Mar. 7, 2008). Many of the comments asked the EPA to specify when a CAFO "proposes" to discharge. *Id*. In response, on March 7, 2008, the EPA published a supplemental notice of proposed rulemaking (hereinafter the Supplemental Proposed Rule). *See generally* 73 Fed. Reg. 12,321-02. The Supplemental Proposed Rule provided that a CAFO does not

---

Furthermore, the Rule requires:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

*Id*. § 553(c).

discharge or propose to discharge if "based on an objective assessment of the conditions at the CAFO, that the CAFO is designed, constructed, operated, and maintained in a manner such that the CAFO will not discharge." *Id.* at 12,339. Furthermore, if a CAFO operator makes this showing, the operator can apply for voluntary certification. *Id.* The benefit of voluntary certification is that, in the event of a discharge, an unpermitted CAFO will not be liable "for violation of the duty to apply," but will still be in violation of the CWA's prohibition against unpermitted discharges. *Id.*

On November 20, 2008, the EPA published the 2008 Rule, which incorporates the proposed regulations in the Proposed Rule and the Supplemental Proposed Rule. *See* 73 Fed. Reg. 70,418 (Nov. 20, 2008). In sum, the 2008 Rule clarifies the "duty to apply" liability scheme. *Id.* at 70,423. It reiterates that CAFOs "propose to discharge" if they are "designed, constructed, operated, or maintained such that a discharge would occur." *Id.* Furthermore, each CAFO operator is required to make an objective case-by-case assessment of whether it discharges or proposes to discharge, considering, among other things, climate, hydrology, topology, and the man-made aspects of the CAFO. *Id.* at 70,424. It further clarifies that a CAFO can be held liable for failing to apply for a permit, in addition to being held liable for the discharge itself. *Id.* at 70,426. The 2008 Rule also reiterates that certification is voluntary, but if a CAFO does not certify, in an enforcement proceeding for failing to apply for a permit, the CAFO would have the burden of proving that it did not propose to discharge. *Id.* Finally, with regard to NMPs, the 2008 Rule restates that NMPs are an enforceable part of an NPDES permit and clarifies that the terms of NMPs would remain the same as the terms articulated in the 2003 Rule. *Id.* at 70,443.

On December 4, 2008, the 2008 Rule became final for purposes of seeking

No. 08-61093

judicial review.  73 Fed. Reg. at 70,418.  As required by 33 U.S.C. § 1369(b),[19] each of the Farm Petitioners and Poultry Petitioners[20] (collectively, the Farm Petitioners) timely filed petitions for review, challenging certain provisions of the 2008 Rule, in various courts of appeals, namely, this court[21] and the Seventh,[22] Eighth,[23] Ninth,[24] Tenth,[25] and District of Columbia[26] Circuits.

---

[19] Section 1369 provides in relevant part:

> (b) Review of Administrator's actions; selection of court; fees
>
> (1) Review of the Administrator's action . . . in making any determination as to a State permit program submitted under section 1342(b) of this title, []in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, [or] in issuing or denying any permit under section 1342 of this title . . . may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application *shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial*, or after such date only if such application is based solely on grounds which arose after such 120th day.

33 U.S.C. § 1369(b) (emphasis added).

[20] Although the Poultry Petitioners challenge certain provisions of the 2008 Rule jointly with the Farm Petitioners, they also filed a separate challenge to the EPA Letters.  Thus, for purposes of clarity, hereinafter, references to the Farm Petitioners refer to the Farm Petitioners' and Poultry Petitioners' challenges to provisions of the 2008 Rule.  References to the Poultry Petitioners refer to the Poultry Petitioners' separate challenge to the EPA Letters.

[21] *Nat'l Pork Producers Council v. Envtl. Prot. Agency*, No. 08-61093 (5th Cir. 2008).

[22] *Dairy Bus. Ass'n Inc v. Envtl. Prot. Agency*, No. 09-1574 (7th Cir. 2009); *Nat'l Milk Producers Fed'n v. Envtl. Prot. Agency*, 08-4166 (7th Cir. 2008).

[23] *United Egg Producers v. Envtl. Prot. Agency*, No. 08-3870 (8th Cir. 2008).

[24] *Natural Res. v. Nat'l Pork*, No. 08-75023 (9th Cir. 2008).

[25] *Nat'l Pork Producers v. Envtl. Prot. Agency*, No. 08-9584 (10th Cir. 2008).

[26] *N.C. Pork v. Envtl. Prot. Agency*, No. 08-1387 (D.C. Cir. 2008).

No. 08-61093

Because an agency is required to notify the Judicial Panel on Multi-district Litigation (JPML) if two or more petitions for review are filed that challenge an agency's promulgation of regulations, the EPA notified the JPML of the various challenges.  28 U.S.C. § 2112(a)(3).  Subsequently, per section 2112, this court was randomly selected by the JPML, from the courts of appeals in which petitions for review were filed, to address the parties' challenges.  *Id.* Accordingly, the petitions were consolidated and transferred to this court from our sister circuits.

On appeal, the Farm Petitioners primarily challenge the EPA's "duty to apply" for an NPDES permit, imposition of liability for failing to apply for a permit, and the EPA's regulation of a permitted CAFO's land application.

**b.     The EPA Letters**

Shortly after the EPA issued the 2008 Rule, it issued three guidance letters, a common practice following the issuance of complex regulations.  *See generally Appalachian Power Co. v. Envtl. Prot. Agency*, 208 F.3d 1015, 1020 (D.C. Cir. 2000).  On January 16, 2009, Benjamin H. Grumbles, Assistant Administrator for the EPA's Office of Water, sent a letter to Senator Thomas R. Carper of Delaware; on the same day, Grumbles sent an identical letter to then-congressperson Michael N. Castle of Delaware; and on March 4, 2009, James D. Giattina, Director of the Water Protection Division for Region 4, sent a letter to Jeff Smith, an executive for Perdue Farms, Inc.

The guidance letters sent to the Delaware Congress members were in response to their joint letter to the EPA concerning "the status of EPA's authorization of Delaware's [state-run CAFO] program." Grumbles explained that Delaware's CAFO program was denied status because it did not comply with the CWA.  Notably, the Delaware program requires a permit only if "a CAFO meets the numerical animal limit, has a discharge into waters of the state, and is in non-compliance with Delaware Nutrient Management

13

Regulations." The guidance letters further explained the EPA's requirements for a state-run CAFO program and that these requirements were the national floor for these programs. They also stated that the CWA prohibits the discharge of all pollutants by a CAFO. Moreover, "[t]he term pollutant is defined very broadly in the CWA . . . . Potential sources of such pollutants at a CAFO could include . . . litter released through confinement house ventilation fans." The guidance letters further explained that "any point source discharge of stormwater that comes into contact with these materials and reaches waters of the United States is a violation of the CWA unless authorized by a [permit]."

The letter sent by Giattina was in response to questions posed by Smith, regarding Smith's concern that certain EPA field offices were incorrectly interpreting the 2008 Rule. Relevant here, Smith asked whether operators of dry litter farms need to apply for a permit "because of potential runoff from the production area[, and if] so, are there examples of dry poultry litter operations having a discharge?" The letter explained that all CAFOs must have permits prior to discharging pollutants and that "pollutant" is defined broadly by the CWA and the regulations could include litter released through confinement house ventilation fans. The letter also discussed the agricultural stormwater exemption, explaining that it "applies only to precipitation-related discharges from land application areas . . . where application of manure, litter, or process wastewater is in accordance with appropriate nutrient management practices," and not to "discharges from the CAFO production area."

As required by the APA, on April 12, 2009, within 120 days of the issuance of the guidance letters, the Poultry Petitioners filed their petition for review, challenging the EPA Letters. The Poultry Petitioners argue that the EPA Letters constitute final agency actions subject to judicial review and, among other things, were required to have undergone notice and comment per the rulemaking procedures articulated in the APA. *See* 5 U.S.C. § 553. The EPA

No. 08-61093

subsequently filed a motion to dismiss the Poultry Petitioners' claim, arguing that we do not have jurisdiction to hear challenges to guidance letters that are merely articulations of current rules and regulations.

Our analysis of the Farm Petitioners' claims and Poultry Petitioners' claims proceeds as follows. Part II is divided into two parts. In subpart A, we discuss the Farm Petitioners' challenges. We GRANT the petition in part and DENY the petition in part. In subpart B, we address the Poultry Petitioners' challenge to the EPA Letters. We DISMISS their petition for lack of jurisdiction per the EPA's motion.

## II.  Analysis

### A.     Farm Petitioners' Challenges

The Farm Petitioners' challenges to the 2008 Rule can be sub-divided into two parts. First, they effectively challenge the "duty to apply" liability scheme. Second, they challenge the Rule's regulation of CAFO land application discharges. Below we address each of these challenges in turn.

#### 1.      Duty to Apply Liability Scheme

The duty-to-apply liability scheme has three parts. To begin, the 2008 Rule requires CAFOs that discharge or propose to discharge to apply for an NPDES permit—the duty to apply. If a CAFO discharges and does not have a permit, the CAFO will not only be liable for discharging without a permit, but also prosecuted for failing to apply for a permit—failure to apply liability. However, a CAFO can circumvent this liability if the CAFO operator can establish that the CAFO was designed, constructed, operated, and maintained in a manner such that the CAFO will not discharge. The Farm Petitioners argue that certain parts of the liability scheme are in excess of the EPA's statutory authority and other parts are violations of the APA.

Our review of the Farm Petitioners' challenges rests, for the most part, on the Second Circuit's determination in *Waterkeeper* and whether the EPA's

15

actions are within the scope of its statutory authority.  As such, our analysis is guided by the principles enunciated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  If Congress has "directly spoken to the precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43 (footnote omitted).  If the court determines that the statute is silent or ambiguous with respect to the specific question at issue, then we consider "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  We use the traditional tools of statutory construction to determine whether Congress has spoken to the precise point at issue.  *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Bd.*, 201 F.3d 551, 554 (5th Cir. 2000).

We conclude that the CWA provides a comprehensive liability scheme, and the EPA's attempt to supplement this scheme is in excess of its statutory authority.

### a.     Duty to Apply

The 2003 Rule's "duty to apply" required all CAFOs to apply for an NPDES permit or demonstrate that they do not have the potential to discharge.  68 Fed. Reg. at 7266.   In *Waterkeeper*, the Second Circuit held that the 2003 Rule's "duty to apply" was *ultra vires* because the EPA exceeded its statutory authority. *Waterkeeper*, 399 F.3d at 504.  The court explained that the CWA is clear that the EPA can only regulate the discharge of pollutants.  To support its interpretation, the Second Circuit examined the text of the Act.  The court noted: (1) 33 U.S.C. § 1311(a) of the CWA "provides . . . [that] the *discharge of any pollutant* by any person shall be unlawful," (2) section 1311(e) of the CWA provides that "[e]ffluent limitations . . . shall be applied to all point sources of *discharge of pollutants*," and (3) section 1342 of the Act gives NPDES authorities the power to issue permits authorizing the *discharge of any pollutant or*

*combination of pollutants.*"  *Waterkeeper,* 399 F.3d at 504.  Accordingly, the
Second Circuit concluded that

> in the absence of an actual addition of any pollutant to
> navigable waters from any point, there is no point
> source discharge, no statutory violation, no statutory
> obligation of point sources to comply with EPA
> regulations for point source discharges, and no
> statutory obligation of point sources to seek or obtain
> an NPDES permit in the first instance.

*Id.* at 505.  The Second Circuit's decision is clear: without a discharge, the EPA
has no authority and there can be no duty to apply for a permit.

The EPA's response to this part of the *Waterkeeper* analysis is the 2008
Rule's requirement that CAFOs that discharge *and* CAFOs that "propose" to
discharge apply for a permit.  We address the latter category first.

### i.      CAFOs that Propose to Discharge

Because the issues presented in *Waterkeeper* are similar to the issues
presented here, we find the Second Circuit's analysis to be instructive and
persuasive.  Accordingly, we decline to uphold the EPA's requirement that
CAFOs that propose to discharge apply for an NPDES permit.

At first blush it seems that the EPA, by regulating CAFOs that "propose"
to discharge, is regulating CAFOs that *want* to discharge.  However, as the Farm
Petitioners' counsel explained at oral argument, the EPA's use of the term
"propose" is not the same as the common understanding of the term—"to form
or declare a plan or intention."  WEBSTER'S THIRD NEW INTERNATIONAL
DICTIONARY 1819 (8th ed. 1993).  Instead, the EPA's definition of a CAFO that
"proposes" to discharge is a CAFO designed, constructed, operated, and
maintained in a manner such that the CAFO will discharge.  Pursuant to this
definition, CAFOs propose to discharge regardless of whether the operator wants
to discharge or is presently discharging.  This definition thus requires CAFO
operators whose facilities are not discharging to apply for a permit and, as such,

runs afoul of *Waterkeeper*, as well as Supreme Court and other well-established precedent.

Specifically, the Supreme Court explained:

> [T]he National Pollutant Discharge Elimination System [requires] a permit for the 'discharge of any pollutant' into the navigable waters of the United States, 33 U.S.C. § 1342(a). The triggering statutory term here is not the word 'discharge' alone, but 'discharge of a pollutant,' a phrase made narrower by its specific definition requiring an 'addition' of a pollutant to the water.

*S.D. Warren Co. v. Maine Bd. of Envtl. Protection*, 547 U.S. 370, 380–81 (2006). Likewise, several circuit courts have held that the scope of the EPA's authority under the CWA is strictly limited to the discharge of pollutants into navigable waters.

Notably, in the seminal case *Natural Resources Defense Council, Inc. v. Environmental Protection Agency*, 859 F.2d 156 (D.C. Cir. 1988), the D.C. Circuit explained more than 20 years ago that the CWA "does not empower the agency to regulate point sources themselves; rather, EPA's jurisdiction under the operative statute is limited to regulating the discharge of pollutants." *Id*. at 170. In *Waterkeeper*, the Second Circuit echoed this interpretation of the CWA and explained that "unless there is a discharge of any pollutant, there is no violation of the Act . . . ." 399 F.3d at 504. More recently, in *Service Oil, Inc. v. Environmental Protection Agency*, 590 F.3d 545 (8th Cir. 2009), the Eighth Circuit reiterated the scope of the EPA's regulatory authority and concluded that "[b]efore any discharge, there is no point source" and the EPA does not have any authority over a CAFO. *Serv. Oil, Inc.*, 590 F.3d at 550.

These cases leave no doubt that there must be an actual discharge into navigable waters to trigger the CWA's requirements and the EPA's authority. Accordingly, the EPA's authority is limited to the regulation of CAFOs that

discharge.  Any attempt to do otherwise exceeds the EPA's statutory authority.
Accordingly, we conclude that the EPA's requirement that CAFOs that "propose"
to discharge apply for an NPDES permit is *ultra vires* and cannot be upheld.

### ii.  Discharging CAFOs

Although the CWA forecloses the EPA's regulation of a CAFO before there
is a discharge, the question remains: Can the EPA require discharging CAFOs
to apply for an NPDES permit?   This analysis necessitates application of
*Chevron*'s two-step inquiry.  *Chevron* step one requires the court to determine,
if Congress, through the CWA, has spoken directly on the issue of whether the
EPA can require a discharging CAFO to apply for a permit.  *Chevron*, 467 U.S.
at 842–43.  As there is no language in the CWA that creates a "duty to apply" for
an NPDES permit, our analysis centers on *Chevron* step two—whether the
regulation "is based on a permissible construction of the statute."  *Id.*

We accord "deference to agencies under *Chevron* because of a presumption
that Congress, when it left ambiguity in a statute meant for implementation by
an agency, understood that the ambiguity would be resolved, first and foremost,
by the agency, and desired the agency (rather than the courts) to possess
whatever degree of discretion the ambiguity allows."  *Tex. Clinical Labs, Inc. v.
Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).   However, a *Chevron* step two
analysis depends on "a number of factors.  These include: the consistency of the
interpretation and the length of adherence to it, undisturbed by Congress; the
explicitness of the congressional grant of authority to the agency, with greater
deference in cases of more specific delegation; and the degree of agency expertise
necessarily drawn upon in reaching its interpretation."  *Quarles v. St. Clair*, 711
F.2d 691, 706–07 (5th Cir. 1983).

The primary purpose of the NPDES permitting scheme is to control
pollution through the regulation of discharges into navigable waters.  *See* 33
U.S.C. § 1342.  Therefore, it would be counter to congressional intent for the

court to hold that requiring a discharging CAFO to obtain a permit is an unreasonable construction of the Act. In fact, the text of the Act indicates that a discharging CAFO must have a permit. The CWA explains that discharging without a permit is unlawful, 33 U.S.C. § 1311, and punishes such discharge with civil and criminal penalties, 33 U.S.C. § 1319. This has been the well-established statutory mandate since 1972. It logically follows that, at base, a discharging CAFO has a duty to apply for a permit.

In summary, we conclude that the EPA cannot impose a duty to apply for a permit on a CAFO that "proposes to discharge" or any CAFO before there is an *actual* discharge. However, it is within the EPA's province, as contemplated by the CWA, to impose a duty to apply on CAFOs that are discharging.

### b.    Failure to Apply Liability

The 2008 Rule provides that a CAFO can be held liable for failing to apply for a permit. The Farm Petitioners contend that the EPA does not have the authority to create this liability. We agree. As previously noted, if Congress has "directly spoken to the precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43 (footnote omitted). Here, the CWA is clear about when the EPA can issue compliance orders,[27] bring a civil suit for an injunction[28] or penalties,[29] or bring criminal charges for penalties.[30] Specifically, 33 U.S.C. § 1311 allows the EPA to impose liability if it "finds that any person is in violation of any condition or limitation which implements [violations of]": the discharge

---

[27] 33 U.S.C. § 1319(a).

[28] *Id.* § 1319(b).

[29] *Id.* § 1319(d).

[30] *Id.* § 1319(c).

prohibition,[31] certain water-quality based effluent limitations,[32] national standards of performance for new sources,[33] toxic and pretreatment effluent standards,[34] the EPA's information-gathering authority,[35] provisions permitting the discharge of specific aquaculture pollutants,[36] any permit condition or limitation,[37] and provisions governing the disposal or use of sewer sludge.[38] Notably absent from this list is liability for failing to apply for an NPDES permit.

Moreover, section 1319 is the only provision in the Act to provide for penalties. Assuming that the punishment for failing to apply for a permit are section 1319's penalties, the EPA still runs up against the CWA's clear articulation that only certain violations of the Act can be enforced using section 1319's penalties. *See* 33 U.S.C. § 1319; *see, e.g., Serv. Oil, Inc.*, 590 F.3d at 550 ("Congress in § 1319(g)(1) granted EPA limited authority to assess administrative monetary penalties for violations of specific statutory provisions related to the core prohibition against discharging without a permit, or contrary to the terms of a permit."); *Colt Indus., Inc. v. United States*, 880 F.2d 1311, 1314 (Fed. Cir. 1989) ("EPA is not authorized under either the Clean Air or Clean Water [A]cts to seek compensatory damages; it is limited to injunctive relief and

---

[31] *Id*. § 1311.

[32] *Id*. § 1312.

[33] *Id*. § 1316.

[34] *Id*. § 1317.

[35] *Id*. § 1318.

[36] *Id*. § 1328.

[37] *Id*. § 1342.

[38] *Id*. § 1345.

the maximum monetary penalties prescribed by 42 U.S.C. § 7413(b), and 33 U.S.C. § 1319, respectively."). Accordingly, the imposition of "failure to apply" liability is outside the bounds of the CWA's mandate.

The Eighth Circuit's analysis in *Service Oil* is instructive. In that case, the court examined whether the EPA can assess administrative penalties for failing to apply for an NPDES permit. As the EPA argues here, it also argued in *Service Oil* that section 1318, which gives the EPA its information-gathering authority, also gives the EPA power to impose liability for failing to apply for an NPDES permit. 590 F.3d at 550. The Eighth Circuit rejected this argument. In concluding that the EPA cannot assess such penalties, the court commented on the scope of the EPA's regulatory authority. The court explained that "the agency's authority to assess monetary penalties by administrative proceeding is limited to unlawful discharges of pollutants." *Id.*; *see also Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.,* 469 F. Supp. 2d 803, 826 (N.D. Cal. 2007) (finding 33 U.S.C. § 1342(p) does not authorize liability for "failure to apply" for NPDES permit coverage, but only for non-compliance with permit terms).

*                    *                    *

For more than 40 years, the EPA's regulation of CAFOs was limited to CAFOs that discharge. The 2003 Rule marked the first time that the EPA sought to regulate CAFOs that do not discharge. This attempt was wholly rejected by the Second Circuit in *Waterkeeper*. 399 F.3d at 504. Again, with the 2008 Rule, the EPA not only attempts to regulate CAFOs that do not discharge, but also to impose liability that is in excess of its statutory authority. Although *Chevron* makes clear that we must give deference to the agency's interpretation of a statute, "courts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with the statutory mandate or that frustrate the congressional policy underlying a statute." *Tex. Power & Light Co. v. FCC*, 784 F.2d 1265, 1269 (5th Cir. 1986)

(citations and internal quotation marks omitted); *see also Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*, 194 F. 3d 125, 128–29 (D.C. Cir. 1999) ("[D]eference is not without limit. We will reject an agency's interpretation if an alternative reading is compelled by the regulations' plain language . . . ." (citation and internal quotation marks omitted)).

To this end, the Supreme Court has explained: "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001). In other words, an agency's authority is limited to what has been authorized by Congress. *See id.* Here, the "duty to apply", as it applies to CAFOs that have not discharged, and the imposition of failure to apply liability is an attempt by the EPA to create from whole cloth new liability provisions. The CWA simply does not authorize this type of supplementation to its comprehensive liability scheme. Nor has Congress been compelled, since the creation of the NPDES permit program, to make any changes to the CWA, requiring a non-discharging CAFO to apply for an NPDES permit or imposing failure to apply liability. Thus, we echo the sentiments of the Second Circuit in *Waterkeeper*:

> While we appreciate the policy considerations underlying the EPA's approach in the CAFO Rule, however, we are without authority to permit it because it contravenes the regulatory scheme enacted by Congress . . . . To the extent that policy considerations do warrant changing the statutory scheme, such considerations address themselves to Congress, not to the courts.

*Waterkeeper*, 399 F.3d at 505 (citations and internal quotation marks omitted).

### 2.    Land Application

The Farm Petitioners argue that the EPA's requirement that all NMPs

address protocols for land application exceeds the EPA's statutory authority.[39] Our analysis of this issue necessitates a brief overview of the relevant parts of the 2003 Rule and the Second Circuit's discussion of the 2003 Rule in *Waterkeeper*.

As previously noted, the 2003 Rule established a mandatory duty for all CAFOs applying for a permit to develop and implement an NMP, which required a CAFO to establish BMPs. The BMPs were designed to ensure adequate storage of manure and wastewater, proper management of mortalities and chemicals, and relevant here, appropriate site specific protocols for land application. *See* 68 Fed. Reg. at 7176. However, NMPs (and thus BMPs) were not required to be part of a CAFO's NPDES permit.

In *Waterkeeper*, the parties disputed "whether the terms of the [NMPs], themselves, constitute effluent limitations that must be included in the NPDES permits." 399 F.3d at 502. The Second Circuit held that because the 2003 Rule failed to require that the terms of NMPs be included in NPDES permits, the 2003 Rule violated the CWA. The court explained that the CWA defined effluent limitation as "'any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources . . .'" *Id*. (citing 33 U.S.C. § 1362(11)). Because "the requirement to develop [an NMP] constitutes a restriction on *land application discharges*," the court held, there was no doubt that the CWA's definition of effluent limitation encompassed an NMP. *Waterkeeper*, 399 F.3d at 502 (emphasis added). Thus, the Second Circuit concluded that the EPA must incorporate CAFOs' site-specific NMPs into their permits.

Accordingly, the 2008 Rule requires that "[a] permit issued to a CAFO

---

[39] As previously explained, treated manure from CAFOs is typically applied to cropland as fertilizer. This fertilizing process is called land application.

must include a requirement . . . to develop and implement" an NMP. 73 Fed. Reg. at 70,437. The Farm Petitioners argue that the EPA's response to the Second Circuit's mandate is impermissible because it allows CAFOs to regulate all land application, even if the land application is applied pursuant to an NMP. They further contend that, in violation of the CWA's jurisdictional limits and *Waterkeeper*, the EPA requires CAFOs that seek permit coverage only for production area discharges to apply also for coverage for land application areas.

The Farm Petitioners' arguments are problematic because they are challenging a requirement promulgated in the 2003 Rule. Thus, the Farm Petitioners' arguments had to be made within the 120-day time period for challenging rules promulgated by an agency. 33 U.S.C. § 1369(b)(1). The 120-day time limit is well-established, and this court has explained that the limitation is strictly enforced. *See Tex. Mun. Power Agency v. Envtl. Prot. Agency*, 799 F.2d 173, 175 (5th Cir. 1986). The only exception to this limitation is if the grounds for the challenge arose after the 120-day time period. *Id.* It is clear that the grounds for the challenges made by the Farm Petitioners did not arise after the 120-day time period. Notably, the Farm Petitioners, many of whom were parties in *Waterkeeper*, had the opportunity to respond to arguments made by other petitioners in that case, advocating that the NMP terms be included in a CAFO's permit. They did not. Thus, the Farm Petitioners' arguments, regarding NMPs and the protocols for land application, brought almost six years after they were promulgated, are time barred.

**B.    Poultry Petitioners' Challenges**

As previously noted, after the EPA issued the 2008 Rule, it issued three guidance letters. Identical letters were sent to Senator Carper and Representative Castle. The third letter was sent to a farm executive. The Poultry Petitioners' claims center on the substance of the EPA Letters. The guidance letters state that poultry growers must apply for NPDES permits for

the releases of dust through poultry confinement house ventilation fans. The Poultry Petitioners argue that this requirement is a substantive rule because it creates new legal consequences and affects individual rights and obligations. Thus, because the EPA failed to subject this rule to proper notice and comment, as required by the APA, the Poultry Petitioners argue that this court should set aside the EPA Letters' pronouncement as unlawful. The EPA asks that we dismiss the Poultry Petitioners' claim because 33 U.S.C. § 1369(b)(1) governs whether this court has jurisdiction to review an agency action, and the EPA Letters do not fit within subsection 1369(b)(1)'s parameters. We agree and, for the following reasons, dismiss the Poultry Petitioners' claims.

The CWA establishes a bifurcated jurisdictional scheme whereby courts of appeals have jurisdiction over some categories of challenges to EPA action, and the district courts retain jurisdiction over other types of complaints. *Chem. Mfrs. Ass'n v. Envtl. Prot. Agency*, 870 F.2d 177, 265 (5th Cir. 1989). Specifically, 33 U.S.C. § 1369(b)(1) authorizes original jurisdiction to courts of appeals to review certain agency "final actions."[40]   Relevant to the Poultry Petitioners'

---

[40] Specifically, section 1369(b)(1) grants courts of appeals original jurisdiction to review agency "final actions":

> (A) in promulgating any standard of performance under section 1316 of this title,
>
> (B) in making any determination pursuant to section 1316(b)(1)(C) of this title,
>
> (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title,
>
> (D) in making any determination as to a State permit program submitted under section 1342(b) of this title,
>
> (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title,
>
> (F) in issuing or denying any permit under section 1342 of this

No. 08-61093

claims, this court can review an agency's final action (1) approving or promulgating certain effluent limitations, § 1369(b)(1)(E), and (2) issuing or denying certain permits, § 1369(b)(1)(F).

As a threshold matter, in order for this court to have jurisdiction, the guidance letters must constitute an agency final action. The Supreme Court explained in *Bennett v. Spear*, 520 U.S. 154 (1997), that an agency action is final only if it meets two criteria. *Id.* at 177–78. First, the action must mark the "consummation" of the agency's decision-making process; it cannot be tentative or interlocutory. *Id.* Second, the action must be one by which "rights or obligations have been determined" or from which "legal consequences will flow." *Id.*

In regard to the first *Bennett* prong, we note that guidance letters can mark the "consummation" of an agency's decision-making process. *See Her Majesty the Queen in Right of Ontario v. Envtl. Prot. Agency*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (holding that the EPA's guidance letters constitute final agency actions because they "serve[d] to confirm a definitive position that has a direct and immediate impact on the parties . . . ."); *Ciba-Geigy Corp. v. Envtl. Prot. Agency*, 801 F.2d 430, 437 (D.C. Cir. 1986) (finding that the EPA's guidance letters constituted final agency actions because there was "no reason to believe that the EPA Director of Pesticide Programs lack[ed] authority to speak for EPA on th[e] issue or that his statement of the agency's position was only the ruling of a subordinate official that could be appealed to a higher level of EPA's hierarchy." (internal quotations omitted)). However, that the guidance letters can meet the first *Bennett* prong is not enough. *See Bennett*, 520 U.S. at 177

title, and

(G) in promulgating any individual control strategy under section 1314(l) of this title . . .

("[T]wo conditions must be satisfied for agency action to be 'final' . . . ."). There must also be evidence that the guidance letters have made a substantive change in the EPA's regulation of CAFOs. *See id.* at 178.

To meet the second *Bennett* prong, the guidance letters must affect the Poultry Petitioners' rights or obligations or create new legal consequences. *Id.* Although the guidance letters do, as the Poultry Petitioners note, obligate them to obtain a permit if they discharge manure or litter through ventilation fans or face legal consequences, the EPA Letters neither create *new* legal consequences nor affect their rights or obligations. Here, the guidance letters merely restate section 1342's prohibition against discharging pollutants without an NPDES permit. Agency actions that have no effect on a party's rights or obligations are not reviewable final actions. *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593–94 (9th Cir. 2008) (explaining that the second *Bennett* prong was not met where "rights and obligations remain unchanged."); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) ("[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review."). Moreover, an agency's actions are not reviewable when they merely reiterate what has already been established. *See, e.g., Am. Paper Inst. v. Envtl. Prot. Agency*, 882 F.2d 287, 289 (7th Cir. 1989) (a policy statement providing the EPA's views concerning tolerances for dioxin in permits for paper mills was not a final action, because "telegraphing your punches is not the same as delivering them"); *S. Holland Metal Finishing Co. v. Browner*, 97 F.3d 932, 935–37 (7th Cir. 1996) (interpretative ruling, construing regulations, was not final action); *City of San Diego v. Whitman*, 242 F.3d 1097, 1101–02 (9th Cir. 2001) (letter indicating that the Ocean Pollution Reduction Act of 1994, Pub. L. No. 103-431 §§ 1–2, 108 Stat. 4396–97 (1994), would apply to a city's as-yet-unfiled application to renew its NPDES permit was not a final action). The EPA Letters

do not change any rights or obligations and only reiterate what has been well-established since the enactment of the CWA—CAFOs are prohibited from discharging pollutants without a permit.  Thus, they do not meet the two-part *Bennett* test and are not reviewable, final agency decisions.

Accordingly, we grant the EPA's motion to dismiss because we lack jurisdiction to consider the Poultry Petitioners' challenge to the EPA Letters.

### III.  CONCLUSION

For the foregoing reasons, the petitions are granted in part, denied in part, and dismissed in part.  We hereby vacate those provisions of the 2008 Rule that require CAFOs that propose to discharge to apply for an NPDES permit, but we uphold the provisions of the 2008 Rule that impose a duty to apply on CAFOs that are discharging.  We vacate those provisions of the 2008 Rule that create liability for failing to apply for an NPDES permit.  Additionally, we uphold the provisions of the 2008 Rule that allow permitting authorities to regulate a permitted CAFO's land application and include these requirements in a CAFO's NPDES permit.  Finally, we dismiss  the Poultry Petitioners' challenge of the guidance letters for lack of jurisdiction.