38 F.3d 582
 309 U.S.App.D.C. 7, 63 USLW 2320, 16
O.S.H. Cas. (BNA) 2084,
1994 O.S.H.D. (CCH) P 30,559
 ASSOCIATION OF AMERICAN RAILROADS; American Short Line
Railroad Association, Petitioners,
v.
DEPARTMENT OF TRANSPORTATION; Federico F. Pena, Secretary
of Transportation; S. Mark Lindsey, Acting
Administrator, Federal Railroad
Administration; Federal
Railroad
Administration,
Respondents,
Brotherhood of Maintenance of Way Employees, Intervenor.
 No. 93-1208.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 8, 1994.
Decided Oct. 28, 1994.
 
 Karen LeCraft Henderson, Circuit Judge, filed concurring opinion.
 Stephen F. Williams, Circuit Judge, filed dissenting opinion.
 Ronald M. Johnson argued the cause, for petitioners. With him on the briefs, were Mark V. Holden, Robert W. Blanchette, Michael J. Rush and Alice C. Saylor.
 Marleigh D. Dover, Atty., U.S. Dept. of Justice, argued the cause, for respondents. With her on the brief, were Frank W. Hunger, Asst. Atty. Gen., and S. Mark Lindsey, Chief Counsel, Federal Railroad Admin.
 Before WALD, WILLIAMS and HENDERSON, Circuit Judges.
 Opinion for the Court filed PER CURIAM.
 
 
 1
 Concurring opinion filed by Circuit Judge HENDERSON.
 
 
 2
 Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 PER CURIAM:
 
 3
 We conclude that petitioners have standing to challenge the Federal Railroad Administration's bridge worker safety rule, and deny the petition on the merits.
 
 I. BACKGROUND
 
 4
 On June 24, 1992, the Federal Railroad Administration ("FRA") issued a final rule establishing safety standards for employees working on railroad bridges ("bridge worker safety rule"), 57 Fed.Reg. 28,116, codified at 49 C.F.R. pt. 214, pursuant to authority under the Federal Railroad Safety Act ("FRSA") to "issue rules, regulations, orders, and standards for the safety of maintenance-of-way employees, on railroad bridges," FRSA, 45 U.S.C. Sec. 431(n). The rule establishes standards for fall protection, scaffolding, and personal protective equipment. Section 214.101(d) of the rule, however, states that "[a]ny working conditions involving the protection of railroad employees working on railroad bridges not within the subject matter addressed by this Chapter ... shall be governed by the regulations of the ... Occupational Safety and Health Administration."
 
 
 5
 The Association of American Railroads and American Short Line Railroad Association ("AAR"), representing most of the nation's railroads, petition for review, contending that section 101(d) violates the FRSA as amended, which in their view vests exclusive jurisdiction in the FRA to regulate railroad bridge worker safety. In addition, AAR contends that the FRA violated the Administrative Procedure Act ("APA") because its notice of proposed rulemaking failed to give adequate notice that the final rule might permit partial regulation by the Occupational Safety and Health Administration ("OSHA"). Finally, the AAR contends the rule violates the APA because it reverses, without APArequired notice and comment, a 1978 FRA Policy Statement exercising exclusive authority over bridge worker safety.
 
 
 6
 The FRA replies that Sec. 214.101(d) does not delegate authority to OSHA, but instead is merely the FRA's interpretation of the Occupational Safety and Health Act ("OSH Act"). In the FRA's view, OSHA standards apply by default to any aspect of bridge worker safety not covered by the new FRA rule as an exercise of OSHA's residual jurisdiction to regulate workplace safety unless its jurisdiction is ousted by another agency's exercise of authority. The FRA also argues that the final rule, which simply adopts part of the FRA's proposed rule and otherwise leaves in place the status quo of OSHA regulation, is a "logical outgrowth" of the proposed rule. Finally, the FRA argues that the final rule is consistent with the FRA's 1978 Policy Statement, which contrary to the AAR's interpretation did not claim exclusive FRA jurisdiction over bridge worker safety, but instead addressed the narrower subject of "safe working surfaces" on railroad bridges.
 
 II. STANDING
 
 7
 As a threshold matter, the FRA contends the AAR lacks standing to challenge the rule because even without this rule, railroads would be subject to OSHA standards. Consequently, the AAR can show no injury caused by the agency's action. To have standing, petitioners must show an actual or threatened injury "fairly traceable to (i.e., caused by) the challenged regulation, and ... likely to be redressed by the remedy they seek." Competitive Enter. Inst. v. Department of Transp., 856 F.2d 1563, 1565 (D.C.Cir.1988).
 
 
 8
 Here, the AAR alleges sufficient injury-in-fact: it claims the necessity of complying with two sets of regulations enforced by two federal agencies compounds the railroads' compliance burden, regardless of the content of either set of regulations. The AAR also argues that the injury is caused by the FRA's adoption of a bridge worker safety rule that, in the AAR's view, violates the FRSA and reverses the FRA's prior exercise of exclusive jurisdiction over bridge worker safety. Finally, the AAR argues that its injury would be redressed by vacating subsection 101(d) which, in the AAR's view, reverses the FRA's prior exercise of exclusive jurisdiction.
 
 
 9
 We conclude that the AAR has standing because it alleges a sufficiently concrete injury-in-fact, and because it makes colorable legal arguments that the injury is caused by the FRA's adoption of the rule, and is redressable by the relief it seeks. Ultimately we disagree with the AAR's interpretations of both the FRSA and the 1978 Policy Statement. But if the AAR's interpretations of those provisions were correct--so that the FRSA mandates the FRA to exercise exclusive jurisdiction over bridge worker safety, and the FRA's 1978 Policy Statement ousts OSHA of jurisdiction--then it would follow that the bridge worker safety rule violates the FRSA, reverses the FRA's 1978 Policy Statement, and thereby causes previously-inapplicable OSHA regulations to come into play. The FRA's adoption of the rule would thus proximately cause the alleged injury; or, to put it another way, the alleged injury would be fairly traceable to the FRA's adoption of the rule.
 
 
 10
 Moreover, if the AAR is correct in interpreting the 1978 Policy Statement as an exercise of exclusive regulatory authority (and therefore an ouster of OSHA), the injury would also be redressable by the relief petitioners seek.[1] Vacating subsection 101(d) would then leave the 1978 Policy Statement in effect as the FRA's last official word on the subject, retaining the FRA's exercise of authority over all aspects of bridge worker safety, and thus denying OSHA jurisdiction over any aspect of bridge worker safety. Thus, if the AAR's reading of the Policy Statement were correct, and if section 101(d) were vacated, the railroads would not be subject to dual regulation, and the alleged injury would be avoided.
 
 
 11
 Because we find the AAR's interpretations of both the FRSA and the 1978 Policy Statement ultimately unpersuasive, we uphold the rule on the merits. But because the AAR makes at least a colorable argument, it is our view that this case is properly disposed of on the merits, rather than at the threshold stage of standing inquiry.
 
 
 12
 Standing doctrine aims to give concrete effect to the Article III "case or controversy" requirement, which reflects the principle that the work of Article III courts is properly confined to adjudicating live disputes between litigants in a form amenable to judicial proceedings. Here, there is undeniably a live, concrete "case or controversy"; the railroads allege that they are materially harmed by the additional regulatory burden imposed upon them as the result of a federal agency's unlawful adoption of a rule, and seek to have that rule overturned. We hold under the circumstances that the AAR has standing.
 
 
 13
 III. FEDERAL RAIL SAFETY ACT AND Sec. 4(b)(1) OF THE OSH ACT
 
 
 14
 The AAR contends that the standard violates the FRSA, which in the AAR's view vests exclusive authority in the FRA to regulate railroad bridge worker safety. The FRA replies that the FRSA does not vest exclusive jurisdiction in the FRA to regulate all aspects of bridge worker safety, and consequently, under Sec. 4(b)(1) of the OSH Act, OSHA retains residual authority to regulate. Section 4(b)(1) states:
 
 
 15
 Nothing in this [Act] shall apply to working conditions of employees with respect to which other Federal agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.
 
 
 16
 29 U.S.C. Sec. 653(b)(1).
 
 
 17
 We have previously held that under Sec. 4(b)(1), an "exercise of statutory authority to prescribe or enforce standards" means more than merely holding authority to prescribe standards, or merely initiating rulemaking pursuant to that authority. "Congress did not contemplate that there would be no regulation whatever while the FRA is still considering what road to take, nor does a single step down that road carry preemption further than that step itself." Baltimore & O.R. Co. v. OSHRC, 548 F.2d 1052, 1055 (D.C.Cir.1976) (per curiam). See also Donovan v. Red Star Marine Serv., Inc., 739 F.2d 774, 778 (2d Cir.1984) (" 'exercise,' as used in section 4(b)(1) of the Act, requires an actual, concrete assertion of regulatory authority as opposed to mere possession of authority"), cert. denied, 470 U.S. 1003, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1985); Southern Pac. Transp. Co. v. Usery, 539 F.2d 386, 389 (5th Cir.1976) (FRSA and OSH Act "decree[ ] the existence of overlapping authority to regulate railroad safety, with displacement of OSHA coverage by the FRA dependent on unilateral action by the FRA" to "exercise" its authority), cert. denied, 434 U.S. 874, 98 S.Ct. 221, 54 L.Ed.2d 154 (1977).
 
 
 18
 The AAR nonetheless contends that 1988 and 1992 amendments to the FRSA vest exclusive jurisdiction in the FRA to regulate railroad bridge worker safety. The FRSA, as amended, provides that:
 
 
 19
 The Secretary shall ... issue rules, regulations, orders and standards for the safety of maintenance-of-way employees, on railroad bridges. At a minimum, the Secretary shall provide standards for bridge safety equipment, including nets, walkways, handrails, and safety lines, and requirements for the use of boats when work is performed on bridges located over bodies of water.
 
 
 20
 45 U.S.C. Sec. 431(n) (emphasis added).
 
 
 21
 On its face, the statute neither explicitly ousts OSHA of jurisdiction over railroad bridge worker safety, nor does it explicitly vest exclusive authority in the FRA. It does, however, unambiguously require the Secretary to issue some safety regulations--"at a minimum" providing for certain safety equipment and the use of boats. The FRA offers the most plausible reading of the statute, under which it can meet its statutory mandate by issuing a bridge worker safety rule covering these "minimum" requirements. The final bridge worker safety rule in fact does meet these minimum requirements, and also sets standards for scaffolding and "personal protective equipment" including head protection, foot protection, and eye and face protection.
 
 
 22
 We do not find the statute ambiguous on its face, but even if we did, the legislative history confirms the FRA's reading. The AAR relies heavily on a statement by Rep. Dingell, chairman of the House Energy and Commerce Committee, in a 1991 hearing, as evidence that the FRSA vests exclusive authority in the FRA: "[I]f Congress told FRA to do this, what possible justification could there be for FRA to decide that existing OSHA regulations would suffice and so authorize FRA to disregard the clear instructions of the committee?" Railroad Safety Programs: Hearings Before the Subcomm. on Transp. and Hazardous Materials of the House Comm. on Energy and Commerce, 102d Cong., 1st Sess. 69-72 (Apr. 11, 1991). Whatever insight we may glean from a single statement by a single Member of Congress, the statement relied upon by the AAR does not manifest congressional intent to vest exclusive jurisdiction in the FRA, or to require the FRA to issue a comprehensive bridge worker safety rule. More plausibly, Rep. Dingell simply chastised the FRA for failing to issue any rule, even one that met the minimum requirements; his statement is consistent with the FRA's view that it has discretion to defer to some OSHA standards, as long as it issues a rule meeting the FRSA's minimum requirements.
 
 
 23
 The AAR further argues that the FRA's discretion to adopt a partial rule was eliminated by 1992 amendments deleting language providing for the FRA to issue such regulations "as may be necessary." Petitioners' Brief at 26. Again, however, the legislative history does not support the AAR's reading. The House Committee Report states that the amendment was prompted by the FRA's failure to take any action toward promulgating a rule, in violation of the statutory directive. H.R.REP. NO. 102-205, 102d Cong., 1st Sess. 6, reprinted in 1992 U.S.Code Cong. & Admin.News 866 (1993). The Committee Report explains that "as may be necessary" was deleted to "clarify [Congress'] original intent," id. at 11, 1992 U.S.Code Cong. & Admin.News at 872, that the FRA had "discretion only to determine the extent of ... regulations" but no discretion to determine whether a rule-making was needed, id. at 9, 1992 U.S.Code Cong. & Admin.News at 870. The FRA had interpreted "as may be necessary" "to permit the agency to decide whether any ... regulations at all were 'necessary....' " Id. (emphasis added).
 
 
 24
 Thus even if the statute were ambiguous on its face, the legislative history supports the FRA's interpretation. The FRA's interpretation of the FRSA is therefore reasonable, and is entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We conclude that the FRSA does not vest exclusive jurisdiction in the FRA to regulate all aspects of railroad bridge worker safety.
 
 IV. THE 1978 POLICY STATEMENT
 
 25
 The AAR contends the FRA exercised exclusive authority over railroad bridge safety in a 1978 Policy Statement which provides:
 
 
 26
 OSHA regulations would not apply to ladders, platforms, and other surfaces on signal masts, catenary systems, railroad bridges, turntables, and similar structures or to walkways beside the tracks in yards or along the right-of-way. These are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety.
 
 
 27
 43 Fed.Reg. 10,583, 10,587 (Mar. 14, 1978) (emphasis added).
 
 
 28
 The AAR reads this statement as an "exercise" of the FRA's rulemaking authority over working conditions on railroad bridges generally, ousting OSHA of any jurisdiction over railroad bridge worker safety. The AAR, however, takes the quoted language out of context and places more weight on it than it will bear. The Policy Statement starts by stating that the FRA and OSHA share regulatory authority over railroad working conditions, and says the FRA will assume primary authority only in areas involving its special competence over "the safety of railroad operations," defined as "conditions and procedures necessary to achieve the safe movement of equipment over the rails." Id. at 10,585. As an example, the FRA says this includes ensuring that workers "laying or repairing welded rail observe certain procedures impacting on the final condition of the track," and that "proper precautions [are taken] to assure that trackmen are not struck by trains"; but "most hazards related to the handling of welding apparatus are non-operational concerns," and therefore remain subject to OSHA standards. Id. Among the areas implicating "the safety of railroad operations," and therefore to be regulated by the FRA and not OSHA, are "working surfaces" such as "ladders, stairways, platforms, scaffolds and floor openings." Id. at 10,587. Although OSHA standards prescribe what constitutes a safe "working surface," the FRA says OSHA's "working surface" standards should not apply to 1) trains, 2) working surfaces in railroad repair shops, and 3) "ladders, platforms, and other surfaces on ... railroad bridges, turntables, and similar structures," which "are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad [operating] safety." Id. (emphasis added).
 
 
 29
 In context, the language relied upon by the AAR does not assert a broad exemption of railroad bridge workers from all OSHA safety standards. Instead, it simply says that OSHA standards concerning the safety of "working surfaces" will not apply to "ladders, platforms, and other surfaces on ... railroad bridges."
 
 
 30
 Nor has the FRA ever interpreted its 1978 Policy Statement as a broad ouster of OSHA jurisdiction. See, e.g., Notice of Proposed Rulemaking, 56 Fed.Reg. 3434, 3435 (Jan. 30, 1991) (1978 "Policy Statement indicates [that] FRA intended to displace OSHA regulations with respect to the surfaces on bridges, i.e., track structures, but did not intend to prevent OSHA from exercising its more general responsibilities for the safety of railroad workers with respect to fall protection and respiratory equipment") (emphasis added). OSHA standards on such matters as respiratory protection, hazard communication, hearing protection, welding, and lead exposure standards do not fall within the narrow exception for "working surfaces" carved out by the 1978 Policy Statement. The Policy Statement never ousted OSHA's jurisdiction over these matters, and the FRA's final rule, which merely recognizes OSHA's residual authority to regulate these aspects of bridge worker safety, does not "reverse" the 1978 Policy Statement.
 
 
 31
 Nor do the cases cited by the AAR hold otherwise. In Velasquez v. Southern Pac. Transp. Co., 734 F.2d 216 (5th Cir.1984), for example, the Fifth Circuit held that the Policy Statement displaced OSHA jurisdiction over railroad bridge walkways--"working surfaces" over which the FRA, by its own account, claimed exclusive jurisdiction. Velasquez is thus consistent with the FRA's interpretation of the scope of the 1978 Policy Statement.
 
 
 32
 We conclude that the bridge worker safety rule does not constitute a reversal of the FRA's 1978 Policy Statement.
 
 V. NOTICE OF PROPOSED RULEMAKING
 
 33
 The AAR finally contends that because the FRA's Notice of Proposed Rulemaking ("NPRM") indicated that FRA proposed to regulate "all aspects of railroad bridge worker safety," it failed to provide adequate notice of the final rule, which permits OSHA to regulate some aspects of bridge worker safety. Petitioners' Brief at 29.
 
 
 34
 Where a final rule differs from a proposed rule and the agency does not provide separate notice and comment for the final rule, "the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." AFL-CIO v. Donovan, 757 F.2d 330, 338 (D.C.Cir.1985) (quoting United Steelworkers v. Marshall, 647 F.2d 1189, 1221 (D.C.Cir.1980)). "[T]he policies underlying the notice requirement" demand that we inquire whether the notice given affords "exposure to diverse public comment," "fairness to affected parties," and "an opportunity to develop evidence in the record." Small Ref. Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C.Cir.1983).
 
 
 35
 The AAR is correct that in the NPRM, the FRA proposed to "extend its authority to all aspects of railroad bridge worker safety." 56 Fed.Reg. at 3436. But the NPRM also emphasized that "a variety of OSHA rules addressing occupational safety issues commonly found in railroad bridge work" already applied to railroad bridge workers under the agencies' "overlapping jurisdiction with respect to occupational safety and health issues in the railroad industry." Id. at 3434-35. The NPRM noted that "one question [to be addressed in the rulemaking] is whether the occupational safety issues presented by work on railroad bridges are so inherent to the railroad environment that the FRA alone should regulate them, or whether they cut across industry lines without raising special concerns in the railroad context and thus are properly addressed by general OSHA standards." Id. Quite clearly, the NPRM contemplated, gave notice of, and invited comments on the possibility that railroad bridge workers would remain subject to at least some OSHA regulations rather than unique FRA standards. The NPRM also noted that the proposed rule was only "a focus for discussion," that the "form and content of the proposal should not be viewed as exhaustive," and that "FRA is receptive to comments that ... certain standards are unnecessary." 56 Fed.Reg. at 3436. It takes no great leap of logic or imagination to contemplate that the ultimate outcome of this rulemaking might be no rule, or only partial adoption of the proposed comprehensive rule; and in either case, already-applicable OSHA standards would continue to apply to railroad bridge workers by operation of Sec. 4(b)(1) of the OSH Act.
 
 
 36
 After receiving and analyzing comments expressing diverse viewpoints on this very point, the FRA concluded that only part of its proposed rule should be adopted, leaving in place the status quo (OSHA standards) with respect to some aspects of bridge worker safety. The rulemaking thus generated diverse public comment, was fair to affected parties, and gave affected parties an opportunity to develop evidence in the record. Cf. Small Refiner Lead Phase-Down Task Force, 705 F.2d at 547. We conclude that the final rule was the "logical outgrowth" of the proposed rule.
 
 VI. CONCLUSION
 
 37
 For the foregoing reasons, the petition for review of the order of the Federal Railroad Administration is denied.
 
 
 38
 It is so ordered.
 
 
 39
 KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:
 
 
 40
 Although I agree with the majority, I do so with reluctance.
 
 
 41
 The January 1991 NPRM did not even hint that the FRA might select a regulatory approach by which OSHA alone would apply its own standards. The NPRM listed four possible enforcement methods: "(1) Develop and enforce independent FRA standards, (2) adopt and enforce existing OSHA standards, (3) adopt enforcement rules only by which FRA would enforce OSHA standards, or (4) some combination of these." 56 Fed.Reg. 3436 (1991). None of the approaches included OSHA enforcement. Nevertheless, notwithstanding that our "logical outgrowth" precedent is stretched almost to its breaking point here, I believe it rescues the FRA from remand.
 
 
 42
 Moreover, according to the NPRM, the FRA intended to extend its jurisdiction over working conditions regarding railroad bridge worker safety. "After considering the necessity of standards for work on bridges ... FRA now believes that such work may be so much a part of railroad operations that FRA should address this issue in its own regulatory program." Id. at 3435. The FRA thus "propose[d] to extend its authority to all aspects of railroad bridge worker safety." Id. at 3436 (emphases added).[1] Here, what saves section 214.101(d) from violating the notice and comment requirements of section 553 of the APA is its broad exclusionary language: OSHA's residual authority is resurrected but only as to "[a]ny working conditions involving the protection of railroad employees working on railroad bridges not within the subject matter addressed by [Chapter II]." 49 C.F.R. Sec. 214.101(d) (emphasis added). Chapter II encompasses all railroad regulations promulgated by the FRA, including those that fall under the three "fields"[2] and the railroad bridge "working surfaces"[3] first designated in the FRA's 1978 Policy Statement. Although the FRA began its 1991 rulemaking with great promise of comprehensiveness, it reduced its efforts to the "at a minimum" requirements of the 1988 and 1992 amendments plus regulations regarding scaffolding and head, foot, eye and face protection.[4] It then ceded the remainder, including enforcement, to OSHA. The remainder, it turns out, is apparently negligible, at least with respect to railroad bridge worker safety.
 
 
 43
 There is the possibility that OSHA, at a future date, will regulate a working condition not within the subject matter addressed by Chapter II but within the FRA's exercise of jurisdiction over railroad operations as set forth in the 1978 Policy Statement. See 43 Fed.Reg. 10,586 (1978). In that case, we would again face the notice problem. Far from merely "represent[ing] the FRA's thoughts about the effect of its non-comprehensive regulatory scheme on OSHA's authority to regulate railroads," see Dissent at 590-91, section 214.101(d) might have effected a rescission of FRA jurisdiction over that particular working condition--without providing the requisite notice. This possibility is the source of my reluctance. However, the petitioners, which represent the railroad industry, have been unable to identify such a working condition. Accordingly, because the possibility seems so remote, I agree that the petition for review should be denied.
 
 
 44
 STEPHEN F. WILLIAMS, Circuit Judge, dissenting:
 
 
 45
 I agree with the principles the court expresses in finding standing for the petitioners, two railroad associations called collectively the "AAR", but not with the court's application of those principles. The per curiam opinion states that the AAR "makes colorable legal arguments that" its injury--regulation by both the Federal Railroad Administration ("FRA") and the Occupational Safety & Health Administration ("OSHA"), rather than just the FRA--"is caused by the FRA's adoption of the rule, and is redressable by the relief it seeks." Maj.Op. at 585.
 
 
 46
 Given the statutory provision under which the FRA's affirmative regulation would displace regulation by OSHA, Sec. 4(b)(1) of the Occupational Safety and Health Act (the "OSH Act"), 29 U.S.C. Sec. 653(b)(1) (1988), I can understand how AAR's injury would be redressed by an order requiring the FRA to regulate more comprehensively. As the cases cited by the majority, Maj.Op. at 586, explain, FRA regulation of a particular working condition (including an FRA rule providing that a particular working condition should not be regulated at all) would likely operate, under section 4(b)(1), to preclude OSHA regulation of that working condition.
 
 
 47
 But the AAR has not sought comprehensive FRA regulation of railroad working conditions. Instead, it has (except for a throwaway line in its Reply Brief) sought only an order vacating one paragraph of the FRA's newly promulgated rules. The paragraph reads in its entirety as follows:(d) Any working conditions involving the protection of railroad employees working on railroad bridges not within the subject matter addressed by this Chapter, including respiratory protection, hazard communication, hearing protection, welding and lead exposure standards, shall be governed by the regulations of the U.S. Department of Labor, Occupational Safety and Health Administration.
 
 
 48
 49 C.F.R. Sec. 214.101(d) (1993).
 
 
 49
 In effect, this paragraph represents the FRA's thoughts about the effect of its non-comprehensive regulatory scheme on OSHA's authority to regulate railroads. The test of OSHA's authority would presumably come when a railroad resisted OSHA's adoption or enforcement of a rule purportedly applied to railroads and invoked the preclusion provision of Sec. 4(b)(1) of the OSH Act. As I cannot imagine the thoughts of the FRA reflected in Sec. 101(d) swaying any court addressing such an issue, and as the AAR has presented no theory of judicial review under which a court would defer to such thoughts, I do not think that the AAR's argument as to the effect of Sec. 101(d) or the redress to be achieved by its elimination is even colorable.
 
 
 
 [1]
 Our dissenting colleague is incorrect when he writes that petitioners "ha[ve] (except for a throwaway line in [their] Reply Brief) sought only an order vacating one paragraph of the FRA's newly promulgated rules." Dissent at 1. In their petition they asked that this court "declare that the FRA has exclusive jurisdiction over safety issues relating to railroad bridge workers" and "vacate and set aside those portions of the FRA's June 24, 1992 and January 11, 1993 Orders providing otherwise." Petition for Review, at 3-4, in Respondents' Brief, Addendum A. A fair reading of the petitioners' briefs manifests that they make a broad brush challenge and seek relief that redresses their injury
 
 
 [1]
 "By affirmatively asserting regulatory authority over all aspects of railroad bridges, both operational and otherwise, FRA can tailor relevant OSHA regulations to take account of the peculiarities of the railroad environment." 56 Fed.Reg. 3436 (1991) (emphasis added)
 
 
 [2]
 "The overall FRA program to assure the safety of railroad operations may be generally subdivided into three fields: (1) Track, roadbed, and associated devices and structures, (2) equipment, and (3) human factors. FRA has now exercised its statutory authority with respect to each of these regulatory fields by actual rulemaking." 43 Fed.Reg. 10,586 (1978)
 
 
 [3]
 Id. at 10,585
 
 
 [4]
 See 49 C.F.R. Secs. 214.109 (scaffolding), 214.113 (head protection), 214.115 (foot protection), and 214.117 (eye and face protection)