# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 19, 2015

Lyle W. Cayce
Clerk

No. 13-11052

CONTENDER FARMS, L.L.P.; MIKE MCGARTLAND,

> Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY and JONES, Circuit Judges, and GODBEY*, District Judge.

E. GRADY JOLLY, Circuit Judge:

Contender Farms, L.L.P. and Mike McGartland appeal the district court's order granting summary judgment in favor of the United States Department of Agriculture ("USDA"). McGartland owns Contender Farms, and each actively participates in the Tennessee walking horse industry by buying, selling, and exhibiting horses. They challenge a USDA regulation (the "Regulation") promulgated under the Horse Protection Act ("HPA"), 15 U.S.C. §§ 1821–31, requiring that private entities, known as Horse Industry Organizations ("HIOs"), impose mandatory suspensions on those participants

---

* District Judge of the Northern District of Texas, sitting by designation.

No. 13-11052

found to engage in a practice known as "soring."[1]  Soring is prohibited by the HPA, and the USDA, through various contractual arrangements, has long relied on HIOs to provide inspectors at Tennessee walking horse events.

According to Contender Farms and McGartland, this new Regulation exceeds the USDA's rulemaking authority under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), violates the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and fails to account for its impact on small businesses under the Regulatory Flexibility Act, 5 U.S.C. §§ 601–12.  They also argue that the Regulation deprives them of due process and violates the separation of powers.  The USDA disputes each contention, and it further argues that Contender Farms and McGartland fail to present a justiciable controversy on grounds of standing and ripeness.

At summary judgment, the district court held that Contender Farms and McGartland presented a justiciable controversy, but it entered a final judgment in favor of the USDA on the merits of the challenge, concluding that the Regulation is valid.  The parties renew these arguments on appeal.  For the reasons that follow, we AFFIRM the district court's holding as to justiciability, REVERSE and VACATE its ruling on the merits, and REMAND the case for entry of judgment in favor of Contender Farms and McGartland.

I.

To resolve this appeal, we must interpret both the HPA and the USDA regulations promulgated under the HPA.  Ultimately, we must decide whether

---

[1] "Soring" is a process through which trainers may artificially achieve the distinctive gait prized in Tennessee walking horses.  A trainer can teach a horse to attain this gait through legitimate means, but some trainers may produce a similar gait in a horse by applying chemical agents to the skin or utilizing other methods to induce pain in a horse's legs.  These latter practices are known as soring.

No. 13-11052

the Regulation falls within the scope of the USDA's authority under the HPA. We begin with a summary of the statutory and regulatory framework.

The HPA requires the USDA to "prescribe by regulation requirements for the appointment by the management of any horse show, horse exhibition, or horse sale or auction of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter." 15 U.S.C. § 1823(c). Under the HPA, the management of each horse show serves as primary enforcer of the HPA. The HPA provides to the respective managements a choice: (1) decline to hire USDA-approved inspectors and accept liability for failing to disqualify a sored horse, irrespective of whether such management knows that the horse is a sore; or (2) hire USDA-approved inspectors and face liability *only* if management allows the horse to compete after being told that it is a sore. *Id.* at §§ 1824(3) & (5). Most of the major Tennessee walking horse events have chosen to avoid "strict liability" and followed the second option.

Pursuant to the provisions of § 1823(c), the USDA does not employ its own inspectors. Instead, the USDA created, by regulation, what the parties call the "DQP program." The USDA authorizes designated qualified persons ("DQPs"), private individuals holding a valid DQP license, to inspect horses at events. 9 C.F.R. § 11.7(a). In turn, the USDA requires that "[l]icensing of DQP's will be accomplished only through DQP programs certified by the Department and initiated and maintained by horse industry organizations or associations [*i.e.*, HIOs]." *Id.* at § 11.7(b). The USDA established various requirements for HIO-administered training programs, including required hours of classroom instruction in particular topics, production of a sample examination, criteria for maintaining qualifications and performance abilities, methods for insuring uniform interpretation and enforcement of the HPA, and

3

No. 13-11052

standards of conduct for inspectors. *Id.* HIOs must also submit their rulebooks to the USDA. *Id.* at § 11.41.

Under this program, an event's management that wishes to have DQPs perform inspections contracts with an HIO, which then provides the DQPs who perform the inspections. To participate in the event, a competitor must agree to be bound by that HIO's procedures. Traditionally, HIOs imposed penalties for soring violations and provided procedures for appealing those penalties. HIOs were free, however, to vary their penalties and appeals procedures, and competitors had a choice to select events, which could be based in part on a particular HIO's penalties and procedures. Both parties admit that HIO penalties varied, with some imposing mandatory suspensions for certain soring violations and others declining to impose the more stringent penalties.

For years the USDA has sought to reduce such disparities among HIOs. Initially, the USDA entered into voluntary "Operating Plans" with HIOs whereby cooperating HIOs agreed to impose certain penalties for particular violations and honor suspension lists from other HIOs. In 2010, the HIOs could not agree with the USDA on an operating plan. That same year the USDA Office of Inspector General released a report (the "OIG Report"), which concluded that the private system of HPA enforcement through HIOs yielded inconsistent enforcement of the HPA and failed to address adequately the problem of soring.

As a result of the OIG Report, the USDA proposed the Regulation. It solicited public comments on the Regulation and adopted it as a Final Rule in June 2012. The Regulation requires that HIOs adopt mandatory minimum penalties for a number of soring violations as a condition of certification for participation in the DQP program. 9 C.F.R. § 11.25(c). Additionally, the Regulation requires HIOs to adopt an appeals process that "must be approved by the [USDA]," and "the appeal must be granted and the case heard and

decided by the HIO or the violator must begin serving the penalty within 60 days of the date of the violation." *Id.* at § 11.25(e). The Regulation also reiterates that the USDA may institute its own enforcement proceedings pursuant to its authority under the HPA "with respect to any violation of the [HPA], including violations for which penalties are assessed in accordance with this section." *Id.* at § 11.25(f).

## II.

We first consider whether Contender Farms and McGartland present a justiciable controversy. The USDA has raised an issue of standing and an issue of ripeness. We review both issues de novo, and we examine each in turn. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008).

## A.

We begin with the basic proposition that the Constitution limits our jurisdiction to "Cases" and "Controversies." U.S. Const. Art. III, § 2. The doctrine of standing flows from this constitutional limitation and is an essential aspect of it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976). "At bottom, 'the gist of the question of standing' is whether [the parties invoking standing] have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Contender Farms and McGartland can satisfy the constitutional elements of standing by "present[ing] (1) an actual or imminent injury that is concrete and particularized, (2) fairly traceable to the defendant's conduct, and (3) redressable by a judgment in [their] favor." *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014). They must also support

each standing element "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.[2] We conclude that Contender Farms and McGartland satisfy each of the three elements.

### 1.

We initiate our discussion by addressing a basic question that underlies all three elements of standing—"whether the plaintiff is himself an object" of the challenged regulation. *Id.* at 561. If a plaintiff is an object of a regulation "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561–62. By contrast, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* at 562 (internal quotation marks omitted). As this distinction is often a helpful guidepost in the standing inquiry, we examine this matter first and conclude that Contender Farms and McGartland are objects of the Regulation. *See Duarte*, 759 F.3d at 518.

Whether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense. For example, in *Duarte*, we addressed a city ordinance prohibiting registered sex offenders from establishing residence near areas where children gather. *Id.* at 515. A registered sex offender, along

---

[2] As this case is before us on a motion for summary judgment, Contender Farms and McGartland must set forth sufficient facts that comply with Rule 56 of the Federal Rules of Civil Procedure. *Lujan*, 504 U.S. at 561. We note, however, that the district court considered this case through a unique procedure that was, in its terms, "in effect, a bench trial on the written briefs." Neither party indicates that this procedure alters our standard of review on the standing issue. The district court concluded that Contender Farms and McGartland clearly presented a justiciable controversy, and as we explain *infra*, we agree.

with his wife and daughters, challenged the ordinance. We concluded that the registered sex offender was a target of the ordinance, and we "reach[ed] the same conclusion with respect to [his] wife and daughters." *Id.* at 518. The city made the argument that the USDA makes today: that the ordinance applies by its terms only to the individual regulated and not to aggrieved, yet unnamed, parties. We rejected this argument, noting that it "overlooks the practical impact of the Lewisville ordinance on the family [of the sex offender]." *Id.* Thus, we concluded that the family members demonstrated a level of interference as to their lives that was sufficient to establish standing to challenge the regulation.

The Third Circuit applied a similar analysis when a number of sports leagues challenged a New Jersey statute permitting betting on many types of sporting events. *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013) ("*NCAA*"). In *NCAA*, the court noted that New Jersey's law "does not directly regulate the Leagues, but instead regulates the activities that may occur at the State's casinos and racetracks." *Id.* at 219. Although the court expressed reluctance in concluding that the sports leagues could satisfy the standing requirements merely by pointing to the statute, it noted that the law is "in a sense, as much directed at the Leagues' events as it is aimed at the casinos." *Id.* Thus, "[t]his is not a generalized grievance like those asserted by environmental groups over regulation of wildlife in cases where the Supreme Court has found no standing." *Id.*

Applying this commonsense approach to the facts in this case, it is clear that Contender Farms and McGartland are objects of the Regulation. By its terms, the Regulation requires an HIO to *enforce* USDA-approved minimum suspension penalties for many types of soring violations. 9 C.F.R. § 11.25(a). This requirement targets participants in Tennessee walking horse events like Contender Farms and McGartland. The Regulation states that in the event a

DQP discovers a violation, "any individuals who are responsible for showing the horse, exhibiting the horse, entering or allowing the entry of the horse in a show or exhibition, selling the horse, auctioning the horse, or offering the horse for sale or auction must be suspended." *Id.* at § 11.25(b)(1). Thus, the suspensions target *participants* in Tennessee walking horse events like Contender Farms and McGartland, and they are as much objects of the Regulation as the HIOs themselves.

The Regulation requires that an HIO "provide a process in its rulebook for alleged violators to appeal penalties." *Id.* at § 11.25(e). Contender Farms and McGartland must accept an HIO's rulebook as a condition of entry. In the event of any soring violation, they would be subject to the USDA-approved appeal procedures. To compete in an event, Contender Farms and McGartland must agree to be bound by the appeal process found in the HIO's rulebook. Although the HIOs must maintain the appeal procedures, event participants are actually subject to them. Contender Farms and McGartland indicate that they will continue to participate in these events, and they will be bound by these procedures.

We find unpersuasive the USDA's argument that the Regulation targets only those horse owners who sore horses, not owners like Contender Farms and McGartland who purportedly do not. *All* participants in a competition that uses HIOs agree at the outset to be bound by the terms of the HIO's rulebook, which includes the now-mandatory suspension and appeal procedures. The participants also agree to be bound by the inspection procedures. As the record indicates, inspections are far more art than science. In many cases, inspectors, veterinarians, and other professionals will disagree as to whether a horse is actually a sore. The record also suggests that those who actually sore their horses will go to great lengths to hide the results in order to avoid detection, which further muddies the waters with regard to inspections.

No. 13-11052

Finally, we also reject the USDA's argument that Contender Farms and McGartland lack standing because they are not "forced" to use HIO-affiliated shows. The record establishes that the preeminent events in the Tennessee walking horse industry affiliate with HIOs; Contender Farms and McGartland suggest that they could neither earn a living nor compete recreationally without participating in these events. Contender Farms and McGartland are objects of the Regulation because they participate in the type of events that the Regulation seeks to regulate, *i.e.*, the major Tennessee walking horse events. To be clear, this Regulation actually depends on the participation of parties like Contender Farms and McGartland. Thus, we conclude that they are objects of the Regulation.

2.

Next, we find no reason to depart from the ordinary rule that Contender Farms and McGartland, as objects of the Regulation, may challenge it. Contender Farms and McGartland demonstrate a concrete injury resulting from the Regulation that would be redressable by a favorable decision of this Court.

An increased regulatory burden typically satisfies the injury in fact requirement. *See Ass'n of Am. R.R.s v. Dep't of Transp.*, 38 F.3d 582 (D.C. Cir. 1994) ("*American Railroads*"). In *American Railroads*, challengers to a regulation argued that a new rule required them to comply with two sets of regulations enforced by two agencies instead of one. *Id.* at 585. The court concluded that the assertion that railroads "are materially harmed by the additional regulatory burden imposed upon them as the result of a federal agency's unlawful adoption of a rule" established standing. *Id.* at 586.

The Regulation amounts to an increased regulatory burden. Under the Regulation, competitors like Contender Farms and McGartland now face harsher, mandatory penalties from HIOs. Additionally, they may also face

prosecution from the USDA pursuant to its own enforcement authority. Naturally, Contender Farms and McGartland, along with any other competitors, must take additional measures to avoid even the appearance of soring. Contender Farms and McGartland must also agree to the new procedures when they enter a competition, and they forfeit their rights under the previous regulatory framework to "shop around" among competitions employing different HIOs.

Causation and redressability then flow naturally from the injury. The record indicates that HIOs offered a range of penalties and appeals procedures before the USDA adopted the Regulation. Although the USDA correctly notes that HIOs could impose penalties before the promulgation of the Regulation, the record indicates that a number of the HIOs previously opposed mandatory minimum suspensions.[3] If we find that the Regulation is invalid, Contender Farms and McGartland can again participate in competitions with a range of available sanctions and appellate processes.

In sum, Contender Farms and McGartland have standing to challenge the Regulation because they are objects of the Regulation, and they have independently satisfied the three prongs of constitutional standing.

B.

Alternatively, the USDA contends that Contender Farms and McGartland have not presented a *ripe* controversy even if they can meet the elements of standing. According to the USDA, the dispute is unripe because there is only a remote possibility that Contender Farms and McGartland will actually be subject to the mandatory minimum suspensions under the

---

[3] SHOW, Inc., which was a party before the district court, resisted the Regulation. SHOW had not imposed mandatory suspensions prior to the Regulation, and it opposed such penalties after the USDA promulgated the Regulation. Although it was once the largest HIO, it is apparently now inactive.

Regulation because they do not purport to sore horses.  We conclude, however, that the dispute is ripe for review.

The ripeness and standing analyses are closely related, as ripeness inquires as to "'whether the harm asserted has matured sufficiently to warrant judicial intervention.'"  *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544–45 (5th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)).  The USDA argues that this is a pre-enforcement challenge to the Regulation, and in such cases "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted).  When the parties challenge a regulation, the ripeness inquiry seeks

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967) (abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

First, we observe that Contender Farms and McGartland raise a purely legal challenge to the Regulation.  If we adopt their view, the Regulation exceeds the USDA's authority as granted by Congress and violates various constitutional principles.  Thus, "[i]t is unnecessary to wait for the [Regulation] to be applied in order to determine its legality."  *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. Envtl. Prot. Agency*, 752 F.3d 999, 1008 (D.C. Cir. 2014).  Moreover, the USDA has promulgated a final rule, and it appears from this litigation that it has every intention of requiring HIOs to adopt these

11

requirements or face decertification from the DQP program.  As we explained above, this will affect Contender Farms and McGartland.

As the Supreme Court noted in *Driehaus*, "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."  134 S. Ct. at 2345.  The challenge here is similar to that in *Driehaus*, where a public interest group challenged an Ohio law prohibiting false advertising about a political candidate.  The group had accused a congressional candidate of supporting a measure that included "taxpayer-funded abortion," and the candidate filed a challenge based on the false advertising law.  *Id.* at 2339.  A panel found probable cause that the group violated the law, but the candidate lost and dropped his challenge before it could be finally resolved.  *Id.* at 2339–40.  To support justiciability, the group claimed that it intended to engage in similar future activity, and it sought to proceed with its challenge to the law.  *Id.* at 2343.  The Supreme Court concluded that the alleged future conduct was "arguably" proscribed by the law, particularly given its broad reach.  *Id.* at 2344.  This Regulation targets soring, which is a practice that yields a large number of "false positives."  Inspectors face significant difficulties distinguishing violators from non-violators.  As in *Driehaus*, Contender Farms and McGartland will encounter these risks because they intend to participate in these events in the future.

Accordingly, we hold that the dispute is ripe for review.  We therefore AFFIRM the district court's ruling as to justiciability, and we proceed to analyze the merits of the challenge to the Regulation.

### III.

Because the USDA is statutorily authorized to administer the HPA, we review the merits of the regulation under the well-established principles of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

(1984). *Dhuka v. Holder*, 716 F.3d 149, 154 (5th Cir. 2013). Under *Chevron*, we must first decide whether "Congress has directly spoken to the precise question at issue," and if it has, we apply Congress's answer to the question. 467 U.S. at 842–43. Alternatively, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Our goal at all times is to effectuate congressional intent, as we presume "that Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *City of Arlington, Tex. v. Fed. Commc'ns Comm'n*, 133 S. Ct. 1863, 1868 (2013) (internal quotation marks omitted).

The district court concluded that the HPA did not address the precise question at issue and, proceeding to the second prong of *Chevron*, it found that the USDA's construction of the statute was reasonable. On appeal, the USDA and its amici urge us to adopt the district court's interpretation of the HPA. Contender Farms and McGartland argue that the HPA addresses this issue and the statute clearly prohibits the Regulation. For the reasons that follow, we agree with Contender Farms and McGartland, and thus we REVERSE and VACATE the district court's ruling on this ground without reaching either the second prong of *Chevron* or the various other issues that Contender Farms and McGartland raise. *See Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (avoiding various constitutional issues by finding that the regulation at issue failed under *Chevron*). We outline the relevant law, parse the Regulation, and then apply the law to the HPA to decide this case.

No. 13-11052

A.

To determine whether a statute is ambiguous, we evaluate it using the "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. Unlike the deference given to agency interpretations of ambiguous statutes, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* Indeed, "[w]here Congress has established a clear line, the agency cannot go beyond it." *City of Arlington*, 133 S. Ct. at 1874.

We determine whether a statute is ambiguous based in part on "the text itself, its history, and its purpose." *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005). Canons of statutory interpretation further assist us in assessing the meaning of a statute. *See Miss. Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 307 (5th Cir. 1994). Several basic considerations guide our inquiry under these canons: (1) we begin with the statute's language; (2) we give undefined words "their ordinary, contemporary, common meaning;" (3) we read the statute's words in proper context and consider them based on the statute as a whole; and (4) we consider a statute's terms in the light of the statute's purposes. *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (internal quotation marks omitted); *see also Bell Atl. Tel. Cos. v. Fed. Commc'ns Comm'n*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (explaining that "text, legislative history, and structure" are traditional tools of statutory interpretation).

Our review is ultimately "'bound, not only by the ultimate purposes Congress has selected but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Texas*, 497 F.3d at 502 (quoting *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994)) (emphasis removed). We do not merely presume that a power is delegated if Congress does not expressly withhold it, as then "'agencies would enjoy virtually

No. 13-11052

limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.'" *Id.* at 503 (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)). Thus, an administrative agency does not receive deference under *Chevron* merely by demonstrating that "a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.*, when the statute is not written in "thou shalt not" terms)." *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (emphasis in the original).

With these principles in mind, we turn first to the challenged Regulation and then to the USDA's regulatory authority under the HPA.

B.

Speaking somewhat broadly, we can say that the Regulation alters but does not eliminate the longstanding practices surrounding the DQP program: HIOs train and certify DQPs according to USDA requirements, which persons then inspect horses at those shows at which the management has contracted with an HIO to provide DQPs. We will now proceed to the relevant aspects of the Regulation.

First, the Regulation imposes mandatory minimum penalties that *must* be assessed *by HIOs* for soring violations. Previously, HIOs developed and enforced their own penalties according to their rulebooks. Although HIOs were required to provide copies of these rulebooks to the USDA, the USDA was not formally involved in writing or imposing penalty assessments. *See* 9 C.F.R. § 11.41 (requiring HIOs to annually furnish the USDA with their rulebooks and disciplinary procedures). Instead, the USDA attempted to influence HIOs through voluntary agreements. Under this Regulation, however, "[e]ach HIO that licenses DQPs . . . *must* include in its rulebook, and enforce, penalties for the violations listed in this section that equal or exceed the penalties listed in paragraph (c) of this section and must also enforce the requirement in

15

No. 13-11052

paragraph (d) of this section."  *Id.* at § 11.25(a) (emphasis added).  Thus, the Regulation establishes the penalties that HIOs must impose as a condition of HIO participation in the DQP program.[4]

Second, the Regulation requires that HIOs establish particular appeals procedures to address disagreements over DQP findings of violations. Specifically, the Regulation provides:

> The HIO must provide a process in its rulebook for alleged violators to appeal penalties.  The process must be approved by the Department.  For all appeals, the appeal must be granted and the case heard and decided by the HIO or the violator must begin serving the penalty within 60 days of the date of the violation.  The HIO must submit to the Department all decisions on penalty appeals within 30 days of the completion of the appeal.  When a penalty is overturned on appeal, the HIO must also submit evidence composing the record of the HIO's decision on the appeal.

*Id.* at § 11.25(e).  Contender Farms and McGartland primarily argue that the sixty-day requirement imposed by the USDA makes it nearly impossible for HIOs adequately to consider the complex issues that often arise with soring allegations.  They also argue that the USDA has not given the HIOs sufficient time to adopt appropriate appeal procedures.  Finally, Contender Farms and McGartland argue that there is insufficient judicial review of these procedures.

---

[4] These mandatory penalties are significant.  Contender Farms and McGartland focus on suspensions for bilateral soring violations, where a horse is sore in both forelimbs or hindlimbs, unilateral soring violations, where a horse is sore in one of its forelimbs or hindlimbs, and violations of the scar rule.  Bilateral soring violations require mandatory suspensions of one year for a first time violation, two years for a second violation, and four years for any subsequent violations.  9 C.F.R. § 11.25(c)(1).  Unilateral soring violations require mandatory suspensions of sixty days for a first offense, one hundred twenty days for a second offense, and one year for subsequent offenses.  *Id.* at § 11.25(c)(2).  For scar rule violations, violators receive mandatory suspensions of fourteen days for a first offense, sixty days for a second offense, and one year for subsequent offenses.  *Id.* at § 11.25(c)(3).

No. 13-11052

Third, the Regulation authorizes the USDA to initiate its own prosecutions for HPA violations, even if the HIOs penalize a violator in accordance with § 11.25(c). Indeed, the Regulation provides:

> The Department retains the authority to initiate enforcement proceedings with respect to any violation of the Act, including violations for which penalties are assessed in accordance with this section, and to impose the penalties authorized by the Act if the Department determines that such actions are necessary to fulfill the purpose of the Act and this part. In addition, the Department reserves the right to inform the Attorney General of any violation of the Act or of this part, including violations for which penalties are assessed in accordance with this section.

*Id.* at § 11.25(f). As the USDA asserts on appeal, it has not delegated *its* enforcement power under the HPA because it expressly reserves its own right to seek civil or criminal penalties. Similarly, it appears that a violator could be *exonerated* by the HIO yet still prosecuted by the USDA on its own authority under the HPA. Indeed, the appeals procedure requires the HIO to submit its records to the USDA, and it appears that the Regulation may *encourage* such prosecutions. *See id.* at §§ 11.25(e)–(f).

In sum, the Regulation is an indisputably significant effort by the USDA to become involved in HIO *enforcement* procedures. Although participants in horse shows have always been subject to regulations from both HIOs and the USDA, the USDA has now taken intrusive steps into the private scheme to strengthen the penalties that HIOs must levy against those found to sore horses. Additionally, the USDA significantly increased its oversight of HIO review procedures. In the past the HIOs could develop their own appeal procedures, but these procedures must now be approved by the USDA and reconfigured in accordance with the USDA's specific requirements. So, we now move on to decide whether the HPA contemplates such USDA involvement in

17

No. 13-11052

HIO enforcement mechanisms and, as we explain below, we conclude that it does not.

C.

The USDA purports to draw its authority to adopt the Regulation from several provisions of the HPA. Upon examining these provisions, we conclude that none of these provisions authorizes the Regulation but conversely, that these provisions plainly prohibit the Regulation.

1.

First, to justify the extension of its authority asserted in the Regulation, the USDA invokes its statutory duty to regulate horse inspectors under § 1823(c). The HPA provides as follows:

> The Secretary shall prescribe by regulation *requirements for the appointment by the management* of any horse show, horse exhibition, or horse sale or auction of persons *qualified to detect and diagnose* a horse which is sore or to *otherwise inspect* horses for the purposes of enforcing this chapter.

15 U.S.C. § 1823(c) (emphasis added). The USDA invoked this provision when it issued its notice of a Final Rule, stating that "requiring HIOs to implement a minimum penalty protocol would strengthen our enforcement of the [HPA] by ensuring that minimum penalties are assessed and enforced consistently by all HIOs that are certified under the regulations pursuant to [§ 1823] of the [HPA]." 77 Fed. Reg. at 33,608. The Regulation plainly imposes conditions of certification for HIOs that build upon the more general regulations the USDA already imposes. *See* 9 C.F.R. § 11.25(a) (referencing the certification conditions in 9 C.F.R. § 11.7).

As always, we begin our initial inquiry by looking to the plain language of § 1823(c). Here, when reduced to its essence, the provision permits the USDA to promulgate "requirements for the appointment by the management . . . of persons qualified to detect and diagnose a horse . . . or to otherwise inspect

18

horses." 15 U.S.C. § 1823(c).  Its meaning hinges on two terms undefined by the statute—"requirements" and "qualified."  Thus, turning to the common understanding of these words, a "requirement" is commonly: "1. That which is required; something needed.  2.  Something obligatory: a prerequisite."  The American Heritage Dictionary of the English Language 1105 (William Morris ed. 1981).  A person is "qualified" if he or she is "[c]ompetent, suited, or having met the requirements for a specific position or task."  *Id.* at 1067.[5]

The USDA relies heavily on the broad definition of "requirements," arguing that the Regulation merely adopts new "requirements for HIOs" that participate in the DQP program.  This may well be true, but the argument is off target.  The statutory authorization to promulgate "requirements" refers, not to requirements for HIOs, but requirements for "persons" to perform inspections of horses.  Section 1823(c) does not authorize the USDA to adopt, *carte blanche*, any condition that it wishes for participation in the DQP program.  Instead, a "requirement" promulgated pursuant to § 1823(c) must relate to whether "persons" are "qualified" to inspect horses for evidence of soring.  Thus, an event's management must appoint inspectors deemed "qualified" by the USDA pursuant to its regulations.

The Regulation here extends the authority of the USDA beyond that statutorily defined mission.  Although federal agencies often possess broad authorities to regulate behavior, an agency may not "create from whole cloth new liability provisions."  *Nat'l Pork Producers Council v. U.S. Envtl. Prot. Agency*, 635 F.3d 738, 753 (5th Cir. 2011) ("*Pork Producers*").  For example, in *Pork Producers* the EPA attempted to impose liability on certain animal

---

[5] Indeed, other dictionaries define both terms using similar language.  *See, e.g.,* The Random House Dictionary of the English Language, The Unabridged Edition 1174, 1219 (Jess Stein ed. 1981).

feeding operations under the Clean Water Act if those operations "propose" to discharge various pollutants into waterways. 635 F.3d at 750–51. We concluded that the Clean Water Act only regulates those who discharge and not those who propose to discharge; thus, the regulation violated the Clean Water Act. *Id.* at 751. We concluded that the EPA could not stray beyond the statute, which evinces the intent of Congress. *Id.* at 751–52.

The USDA urges that its new enforcement regime is a proper assertion of its statutory authority because the HPA anticipates the DQP program, and consequently, this parallel enforcement scheme is within its statutory authorization. But nothing in § 1823(c) contemplates USDA involvement in the *enforcement* procedures of HIOs. Although nothing in the HPA *prohibits* HIOs from voluntarily adopting such procedures, such statutory silence is far from a grant of authority that *permits* the USDA to promulgate regulations imposing uniform penalties. Section 1823(c) plainly allows the USDA only to impose those requirements that relate to the certification and inspection process for individual inspectors.

By contrast, and contrary to the statute, the Regulation establishes a parallel enforcement scheme.[6] It is purportedly a private scheme, but the USDA interjects itself into each layer of enforcement. At the bottom end, it imposes mandatory suspensions on competitors, enforced through the HIOs. Then, the Regulation requires that the HIOs adopt appeal procedures that

---

[6] Indeed, Congress expressly conferred civil and criminal enforcement authority to the USDA elsewhere in the HPA. Such violators of the HPA could be disqualified from participating in horse shows "by order of the Secretary, after notice and an opportunity for a hearing before the Secretary." 15 U.S.C. § 1825(c). By its plain language, the HPA confers upon the *USDA* the ability to disqualify competitors from participating in the Tennessee walking horse industry following notice and a hearing *before the USDA*. This provision addresses the issue of enforcement, and it provides that only the USDA has enforcement power, not HIOs. In the light of § 1825, the USDA possesses only the authority: (1) to provide qualifications for inspectors; and (2) to, itself, assess penalties for HPA violations.

meet the USDA's approval and comply with its timeline. The plain language of § 1823(c) simply does not support these measures.[7]

### 2.

Having decided that § 1823(c) does not support the Regulation, we turn to the rest of the HPA to decide whether any other provision supports the Regulation. The USDA points us to its general rulemaking authority under the HPA, which provides that "[t]he Secretary is authorized to issue such rules and regulations as he deems necessary to carry out the provisions of this chapter." 15 U.S.C. § 1828. According to the USDA and its amici, this broad authority permits this Regulation.

We focus on the terms "provisions of this chapter." By its terms, § 1828 authorizes the USDA to regulate when necessary to effectuate the *other* provisions in the HPA. As counsel for the USDA conceded at oral argument, § 1828 does not purport to allow the USDA to amend the HPA. Thus, this provision is not a stand-alone source of authority to validate any rule the USDA wishes; the provision authorizes the USDA only to regulate in order to carry out the other provisions in the HPA. As we explained above, § 1823(c) does not extend to enforcement-related regulation, and the enforcement provisions in § 1825 apply *only* to the USDA and do not contemplate delegation to third parties.

---

[7] Both parties direct us to passages from the HPA's legislative history, which they submitted as part of the record. These passages suggest that § 1823(c) was passed so that the USDA could provide minimum qualification and certification requirements for horse inspectors. Thus, we agree with Contender Farms and McGartland that the legislative history provides support for our reading of the provision. Congress contemplated that the USDA would exercise its authority to establish training and education programs for horse inspectors. Although § 1823(c) permits the USDA to establish duties for *inspectors*, such duties must be related to their physical inspections of horses. Nothing in this legislative history supports the wholesale creation of an enforcement regime carried out by the HIOs.

No. 13-11052

We find the District of Columbia Circuit's decision in *American Bar Association v. Federal Trade Commission*, 530 F.3d 457 (D.C. Cir. 2005), persuasive. In *American Bar*, the court addressed a challenge to an act requiring that financial institutions establish certain privacy protections. *Id.* at 459. The law also gave the Federal Trade Commission and other agencies broad authority to "'prescribe . . . such regulations as may be necessary to carry out the purposes of this subchapter with respect to the financial institutions subject to their jurisdiction.'" *Id.* at 459 (quoting 15 U.S.C. § 6804(a)(1)). The Federal Trade Commission subsequently asserted that it would apply the law "to regulate attorneys engaged in the practice of their profession," and various bar associations brought suit. *Id.* at 466. The court concluded that the plain language of the statute did not apply to attorneys, and it declined to apply *Chevron* deference. *Id.* at 470–73.

Thus, a broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions. As in *American Bar*, the Regulation addresses an area that is plainly outside the USDA's statutory authority. The HPA authorizes the USDA to develop a private *inspection* system carried out by DQPs who are certified by HIOs, but it does not imply that the USDA may then establish a mandatory private *enforcement* system administered by those HIOs. The USDA's reading of its rulemaking authority under § 1828 of the HPA stretches beyond the statute's plain language. We also reject the USDA's argument that it can maintain this scheme merely because Congress did not expressly *disallow* such regulation. *See id.* at 468. Thus, we hold that § 1828 does not authorize the Regulation.[8]

---

[8] The district court also pointed to Congress's broad factual findings that outlined the problems associated with soring in § 1822, and the USDA points out that the HPA contains a broad prohibition on soring in § 1824. Neither provision supports the Regulation, though, because the USDA is bound by the *means* that Congress has chosen to prevent soring under the HPA. *See Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007). It is clear that

No. 13-11052

In sum, the plain language of the HPA suggests that Congress intended a private horse *inspection* system. This statutory regime does not support the USDA's position that Congress authorized it to promulgate the Regulation, which requires private parties to impose government-mandated suspensions as an arm of HPA *enforcement*.

IV.

After review, we AFFIRM the district court's holding as to justiciability. Contender Farms and McGartland, regular participants in the Tennessee walking horse industry, have standing to challenge the Regulation and present a ripe challenge to it. On the merits, we hold that the district court erred in concluding that the Regulation is a valid application of USDA regulatory authority under the HPA, and accordingly, we REVERSE and VACATE its judgment. Finally, we REMAND the case for entry of judgment in favor of Contender Farms and McGartland.

> AFFIRMED in part; REVERSED and VACATED in part; and REMANDED for entry of judgment for the Plaintiffs.

---

Congress did not authorize the USDA to develop a private enforcement scheme administered by HIOs as a means of policing the HPA.